THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JOHN GUKOUSKI *et al.* Plaintiffs in Error.

*Opinion filed April 19, 1911—Rehearing denied June 7, 1911.*

1. CRIMINAL LAW—*a motion for separate trial is addressed to sound discretion of court.* A motion for the separate trial of certain defendants in a criminal case is addressed to the sound discretion of the trial court, and a denial of the motion will not be reviewed unless it is clear that the trial court abused its discretion.

2. SAME—*value of confessions as evidence depends upon circumstances under which they were made.* The value of confessions as evidence depends upon the circumstances under which they were made, and it is for the jury to say, in view of such circumstances, what weight they are entitled to.

3. SAME—*when confessions are admissible.* Oral statements in a foreign language, written down in English by one police officer in the presence of another, both of whom were fellow-countrymen and understood the language of the declarants, who signed the confession after it had been translated to them, sentence by sentence, are admissible in evidence where the declarants do not deny that the statements were voluntarily made, although they claim they were not correctly transcribed or translated to them.

4. SAME—*jury must decide whether confessions or testimony are true.* Where the testimony of defendants in a criminal case is in conflict with their confessions and affidavits made before the trial, it is for the jury to determine which to believe.

5. SAME—*when co-conspirators are guilty of murder.* Persons who conspire together to do an unlawful act, which includes an assault upon the person of another, must be presumed to have intended to use whatever means may appear to be necessary to overcome such person's resistance in order to enable them to carry out their design, and if one of their number kills such person in the assault upon him all the conspirators are guilty of murder.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. RICHARD S. TUTHILL, Judge, presiding.

WILLIAM PRENTISS, for plaintiffs in error.

W. H. STEAD, Attorney General, JOHN E. W. WAYMAN, State's Attorney, and JOEL C. FITCH, (ROBERT E. CROWE, of counsel,) for the People.

Mr. JUSTICE FARMER delivered the opinion of the court:

On May 5, 1909, between three and four o'clock in the morning, Henry Tietlebaum was fatally shot near a grocery store at 756 West Seventeenth street, in the city of Chicago. Tietlebaum was a bakery-wagon driver employed by Joseph Blonski, a baker doing business at 642 Milwaukee avenue. At that time there was a strike going on among the bakers employed by Blonski. No one other than the parties charged with the shooting saw it, but as soon as the shots were fired a crowd gathered and Tietlebaum was picked up from the sidewalk where he had fallen and taken to a hospital, where he died a short time afterwards. A hat found in the vicinity where the shooting was done led to the arrest of Bladislaus Nogawischi the same day, and from information obtained from him, John Gukouski and Alexander Krolikowski were at once arrested, and about ten days later Wincenty Karcz was arrested in Atlanta, Georgia, and brought back to Chicago. At the May term of the criminal court an indictment was returned against all four of the above named parties, charging them with the murder of Tietlebaum. A trial was had at the November term of said court, the defendants were found guilty as charged in the indictment and the punishment of each was fixed at twenty-five years in the penitentiary. After overruling motions for a new trial and in arrest, judgment was rendered on the verdict. A writ of error has been sued out of this court by Nogawischi, Gukouski and Krolikowski to review that judgment.

At the beginning of the trial, on October 26, 1909, counsel for Gukouski, Nogawischi and Krolikowski made a motion, supported by the affidavit of Nogawischi, for a separate trial from the defendant Karcz. The motion was overruled, and this action of the court is assigned as error. At a previous term all the defendants had been arraigned and entered pleas of not guilty. Such a motion is ad-

dressed to the discretion of the court, and the action of the court in overruling the motion is not subject to be reviewed unless there is a clear abuse of the discretion. (*Gillespie* v. *People,* 176 Ill. 238; *Doyle* v. *People,* 147 id. 394.) From an examination of the affidavit upon which the motion was based we are of opinion there was no abuse of discretion by the court.

Alleged confessions of each of the four defendants were offered and received in evidence. The confession of Nogawischi was made to police officer Kandzia on the day he was arrested and before either of the other defendants had been taken into custody. It was not reduced to writing but was testified to by Capt. Kandzia. Krolikowski and Gukouski the next day made confessions and their confessions were reduced to writing and signed by them. When Karcz was brought back to Chicago he also made a confession, which was reduced to writing and signed by him. Krolikowski and Gukouski also made affidavits used by the police officers in extraditing Karcz. The affidavits purported to relate the circumstances of the shooting of Tietlebaum, and they were sworn to by the parties before Judge Himes, of the municipal court. It is contended these confessions and affidavits were erroneously admitted in evidence by the court.

All the defendants were Poles, and none of them but Nogawischi could speak, read or understand the English language. Capt. Kandzia testified that Nogawischi, when brought to his office after being arrested, was shown the hat that was found in the vicinity of the homicide and said it was his, and said he might as well tell it all. Witness testified he told him to tell the truth, and inquired of Nogawischi if he was willing to have his statement reduced to writing and sign it. He said he was willing to do so, but it was not written out or signed. Witness and Nogawischi talked in the Polish language. Capt. Kandzia testified that the following day Nogawischi, Krolikowski and Gukouski

were all in his office at one time, and in the presence of each other, and in the presence of Sergeant Heilinski and officer Pawlowski, Nogawischi repeated the confession or statement made the day before, substantially as he made it the first time. At the same time Krolikowski and Gukouski made confessions, which were written down by Capt. Kandzia in the English language and were afterwards translated to each of them in the Polish language, sentence by sentence, and signed by Krolikowski and Gukouski, respectively.

Capt. Kandzia testified that Nogawischi said, in the presence of Krolikowski and Gukouski, that the four met in the afternoon before the shooting and agreed to go out to Seventeenth street to upset a baker's wagon; that they met Karcz in front of the elevated station on Eighteenth street, in the vicinity where the homicide was committed, about one or half-past one o'clock in the morning; that Karcz then said, "Now, let's go over and upset the wagon; I know the place and I am the bravest man of us all; I will do the attacking;" that they went to Seventeenth street, near Wood, where Blonski's wagon was expected to deliver bread; that they waited there about two hours before the wagon came; that Nogawischi, Krolikowski and Gukouski hid alongside the house while Karcz remained in front, and when the wagon came Karcz began shooting at the driver. The other three started to run and Nogawischi lost his hat. Capt. Kandzia testified that after Nogawischi had made this statement in the presence of Krolikowski and Gukouski they said it was correct. Witness then asked Krolikowski and Gukouski if they would make a statement and have it written down, and they said they would. Witness testified he told them they did not have to make any statement if they did not wish, and that if they did make it, it might be used against them. They expressed themselves as willing to make the statement. Capt. Kandzia testified they each talked in Polish, and that he translated their

statements into English and wrote them down. After completing the statements he translated them, sentence by sentence, into the Polish language to the parties, and they were then signed by the parties, respectively. Nogawischi was present when these statements were made, translated and signed.

Sergeant Heilinski testified he was a Pole and understood and spoke the Polish language; that he was present when the statements were made by Krolikowski and Gukouski to Capt. Kandzia and written down by him, and that Capt. Kandzia translated the statements from English into Polish before they were signed. The witness testified he, himself, read the statement of Krolikowski.

There is no evidence whatever that these confessions or statements were not freely and voluntarily made. The defendants all testified in their own behalf and did not deny that they made statements about the circumstances of the shooting freely and voluntarily, but they claim the statements they made were not taken down accurately by Capt. Kandzia, or, at least, that they did not know when they signed them that they contained certain matters that were in the papers when they were introduced in evidence. The written statements signed by Krolikowski and Gukouski the day following their arrest purported to be in their language, respectively. The circumstances under which they were made and signed entitled them to be admitted in evidence. The value of confessions as evidence depends upon the circumstances under which they were made. The jury had all the circumstances before them, and the weight and credit to be given to the oral confession of Nogawischi and the written confessions or statements by Krolikowski and Gukouski were matters for them to determine.

The substance of Krolikowski's signed statement was, that about one o'clock in the morning of the shooting Karcz proposed to the other three that they all go to Seventeenth street to upset a bakery wagon and destroy the bread,

and this was agreed to. Karcz said he was the bravest man and would attack the driver. Karcz met the other three in front of the elevated station at Eighteenth street, and the four of them went to the grocery store where the bakery wagon was expected to deliver bread. They waited about an hour, hidden alongside the building, before the wagon came. When the wagon came Karcz jumped out and began to shoot at the driver. Krolikowski didn't know how many shots were fired. When he heard them he ran away and went home. He didn't know Karcz had a pistol. Karcz told him the driver was driving for Blonski, whose bakers were on a strike. The statement of Gukouski was not entirely in the same language as that of Krolikowski, but in their material features the two statements were substantially the same.

While the affidavits sworn to before Judge Himes by Krolikowski and Gukouski are not in the exact language of their signed statements they are substantially so, the only difference being, that in the affidavits they say Karcz said he was the "heaviest" man and would attack the driver, while in the signed statements "bravest" is used instead of "heaviest." Police officer Pawlowski testified he was present when Krolikowski and Gukouski signed and swore to the affidavits before Judge Himes; that they were read over and translated by him correctly in the Polish language, and the parties were told that they need not sign them if they did not want to. Judge Himes testified he remembered swearing the parties to the affidavits; that he believed they were read over to the parties and they were made to understand them before they were signed, but he would not be positive as to that. His best recollection was that they were. We think, under the proof, they were properly admitted in evidence.

Karcz's statement was made the day he returned from Georgia to Chicago. He said he met the other three defendants at the elevated station on Eighteenth street and

asked them what they were doing, and one of them said they were going to upset Blonski's wagon. Karcz said he would go with them, and they went to Seventeenth street near Paulina street. Karcz stopped in front of a grocery store, and the other three went, he did not know where. He lit a cigarette, and when the wagon came he jumped to the driver and told him to keep still and not move. The driver made a motion as if to reach for his pocket and Karcz drew his revolver and fired three shots at him. He then ran away. He threw his revolver away and when he got home told one of the boarders what had happened. The boarder told him he had better go to Atlanta, Georgia, and he went there. He did not know the driver but knew that it was Blonski's wagon and knew that Blonski's bakers were on a strike. They were all bakers by trade, and, as we understand it, members of the Bakers' union. Karcz testified on the trial and denied the correctness of the statement written down by Capt. Kandzia. He did not deny making a statement and that it was written down by Capt. Kandzia, but denied that as written down it was correct. He testified that when he met the other three defendants at the Eighteenth street station he did not know where they were going; that he inquired of them, and they told him they had a friend on Wood street and asked him to go with them; that when they came to Wood street they all took a drink of whisky out of a bottle Gukouski was carrying and then went around a house; that Nogawischi said he would go and find out, and went out somewhere. Karcz asked Krolikowski what they were waiting for, and he said Blonski's wagon. Nogawischi then came back and said, "He is coming." The three, Nogawischi, Krolikowski and Gukouski, then jumped out toward the wagon and Nogawischi drew his revolver. All three of them ran after the wagon and Nogawischi was shooting. Karcz then ran toward Paulina street and went home. He testified that Nogawischi and Krolikowski came to his place and said to

him that if he ever told anybody about what happened they would kill him.

Plaintiffs in error all testified on the trial. They denied stating to Capt. Kandzia that the four defendants went to the grocery store, by agreement, to turn over the bakery wagon and destroy the bread. In substance their testimony was that Karcz asked them to go with him, but they did not at the time know he contemplated anything more than talking with the driver of the bakery wagon. When he spoke of turning the wagon over and destroying the bread they remonstrated with him against it, and when he insisted upon doing so they stopped some little distance before reaching the grocery store and shortly afterwards heard a number of shots fired. They then went home.

The foregoing is the substance of the material testimony upon which the verdict and judgment were based. It will be seen the testimony of plaintiffs in error on the trial was in conflict with that of Karcz, and the testimony of all of them was in conflict with their written confessions and that of Nogawischi with his oral confession. It was the province of the jury, therefore, to determine whether the testimony of the parties on the trial or their confessions and the affidavits of two of them made before the trial were true.

It is very earnestly contended by counsel for plaintiffs in error that if the written statements or confessions of Krolikowski and Gukouski and their affidavits, and also the oral confession of Nogawischi, be accepted as true, they are insufficient to sustain the conviction of plaintiffs in error of the crime of murder. It is argued these confessions show that murder was not in their minds or contemplation; that their only purpose in going to the place where the shooting occurred was to upset the bakery wagon and destroy the bread in it; that they had no knowledge Karcz had a pistol or contemplated shooting the driver of the wagon, and his doing so was a great surprise to them. Ac-

cording to the confessions of the plaintiffs in error the agreement was that they were to go to the store where Tietlebaum, the driver of Blonski's bakery wagon, was expected to deliver bread, and upon his arrival there they were to upset the wagon and destroy its contents, and Karcz, either on account of being the "bravest" or the "heaviest" man of the four, was to attack the driver. The agreement contemplated not only upsetting the wagon and destroying its contents, but personal violence to the driver of it. If their confessions are to be believed, plaintiffs in error anticipated that in accomplishing their object of upsetting the wagon and destroying the bread it would be necessary also to assault the driver. They must be presumed, therefore, to have intended to use whatever means might appear necessary to overcome any resistance of the driver of the wagon in attempting to protect it and its contents and to prevent plaintiffs in error and Karcz from accomplishing their purpose. It was not necessary that they should have expressly agreed to take the life of the driver of the wagon in order to render all of them liable for the act of Karcz in shooting him. They had entered into a conspiracy to perform an unlawful act,—to commit a crime. They contemplated that violence to the person of the driver would be necessary for the carrying out of their conspiracy and common purpose. In such case the law makes all the conspirators liable for the acts of one done in furtherance of the common object.

In *Brennan* v. *People,* 15 Ill. 511, it was said: "The prisoners may be guilty of murder although they neither took part in the killing nor assented to any arrangement having for its object the death of Story. It is sufficient that they combined with those committing the deed to do an unlawful act, such as to beat or rob Story, and that he was killed in the attempt to execute the common purpose. If several persons conspire to do an unlawful act and death happens in the prosecution of the common object, all are

alike guilty of the homicide. The act of one of them done in furtherance of the original design is, in consideration of law, the act of all."

In *Lamb* v. *People,* 96 Ill. 73, it was said: "Where the accused is present and commits a crime with his own hands or aids and abets another in its commission, he may, in either case, be considered as expressly assenting thereto. So where he has entered into a conspiracy with others to commit a felony or other crime under such circumstances as will, when tested by experience, probably result in the unlawful taking of human life, he must be presumed to have understood the consequences which might reasonably be expected to flow from carrying into effect such unlawful combination, and also to have assented to the doing of whatever would reasonably or probably be necessary to accomplish the objects of the conspiracy, even to the taking of life. * * * The principle which underlies and controls cases of this character is the elementary and very familiar doctrine, applicable alike to crimes and mere civil injuries, that every person must be presumed to intend, and is accordingly held responsible for, the probable consequences of his own acts or conduct. When, therefore, one enters into an agreement with others to do an unlawful act he impliedly assents to the use of such means by his co-conspirators as is necessary, ordinary or usual in the accomplishment of an act of that character. But beyond this his implied liability cannot be extended. So if the unlawful act agreed to be done is dangerous or homicidal in its character, or if its accomplishment will necessarily or probably require the use of force and violence which may result in the taking of life unlawfully, every party to such agreement will be held criminally liable for whatever any of his co-conspirators may do in furtherance of the common design, whether he is present or not."

In Wharton on Criminal Law (vol. 1, sec. 220,) it is said: "It is not necessary that the crime should be part of

the original design; it is enough if it be one of the incidental, probable consequences of the execution of that design and should appear at the moment to one of the participants to be expedient for the common purpose. Thus where A and B go out for the purpose of robbing C, and A, in pursuance of the plan and in execution of the robbery, kills C, B is guilty of the murder. In such cases of confederacy all are responsible for the acts of each, if done in pursuance of the common design. This doctrine may seem hard and severe, but, as has been well argued, has been found necessary to prevent persons engaged in riotous combinations from committing murder with impunity, for where such illegal associates are numerous it would scarcely be practicable to establish the identity of the individual actually guilty of a specific wrong."

In McClain on Criminal Law (vol. 1, sec. 196,) the author says: "It results from the principle stated in the preceding section, that everyone connected with carrying out a common design to commit a criminal act is concluded and bound by the act of any member of the combination perpetrated in the prosecution of the common design. But it is not necessary that the crime committed shall have been originally intended. Each is accountable for all the acts of the others done in carrying out the common purpose, whether such acts were originally contemplated or not, if they were the natural and proximate result of carrying out such purpose, and the question whether the result is the natural and probable effect of the wrongful act intended is for the jury. Thus, if several persons agree to commit and enter upon the commission of a crime involving danger to human life, such as robbery, or assault and battery, or resisting an officer or resisting arrest, all are criminally accountable for death caused in the common enterprise. Thus, also, if the unlawful enterprise is likely to meet violent resistance, all will be liable for a felonious assault

committed by one of their number in consequence of such resistance, and if the common design, in general, involves acts of violence, all who participate in the common plan are equally answerable for acts of others done in pursuance thereof, although the result was not specially intended by them all."

If the jury believed the confessions of plaintiffs in error to be true,—and we are unable to say they were not warranted in doing so,—they were justified, under the law, in finding them guilty of the murder of Tietlebaum.

There was no error in the giving or refusing of instructions of such prejudicial nature as to justify a reversal of the judgment, and it is affirmed.    *Judgment affirmed.*