(No. 11594.—Judgment affirmed.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JOSEPH CAMPBELL, Plaintiff in Error.

*Opinion filed February 20, 1918—Rehearing denied April 3, 1918.*

1. CRIMINAL LAW—*admissibility of prejudicial matters in voluntary statement.* A confession is a voluntary declaration by a person charged with crime of his agency or participation in the crime, but a statement denying participation in a crime is not a confession, and anything in such statement which can be used to the prejudice of the declarant can be excluded only on the ground that it was not voluntarily given.

2. SAME—*whether statements are voluntary depends on the circumstances under which made.* Whether statements made by a person at an investigation of the crime of which he is suspected were voluntarily made depends upon the circumstances shown to exist when they were made, and such person is not entitled to testify, on his subsequent trial, that he would not have made the statements if he had known he could have refused to do so, nor to state whether he made the statements voluntarily.

3. SAME—*when it is not error to deny motion to exhume body of deceased in a murder trial.* Where the evidence in a murder trial is conclusive that a murder was committed either by burning or by fracturing the skull and the only question is who committed the crime, it is not error to deny a motion of the defendant to quash the inquest already held and have the body of the deceased exhumed to examine the fracture, where the circumstances are such that it is inconceivable that one person could have caused the fracture and another the burning.

4. SAME—*defendant in murder trial is not made a witness for the People by introduction of his testimony at inquest.* A defendant in a murder trial is not made a witness for the People when the prosecuting attorney introduces the defendant's testimony at the coroner's inquest to impeach his testimony in his own behalf, and the rule against impeaching one's own witnesses cannot be relied upon to protect the defendant in such case.

WRIT OF ERROR to the Circuit Court of Will county; the Hon. FRANK L. HOOPER, Judge, presiding.

F. L. BARNETT, and A. B. COWING, (ROBERT MCMURDY, of counsel,) for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, ROBERT W. MARTIN, State's Attorney, and SUMNER S. ANDERSON, for the People.

Mr. JUSTICE CARTWRIGHT delivered the opinion of the court:

Odette B. Allen was the wife of Edmund M. Allen, warden of the State penitentiary at Joliet. On Saturday, June 19, 1915, Mr. Allen went to Chicago, where Mrs. Allen was expected to join him and both were going to West Baden, Indiana, but she was delayed, and in the afternoon he called her by telephone but did not reach her and talked to Joseph Campbell, a convict under conviction for manslaughter who was runner or house-man for the warden and his family, and told him that he was going to West Baden that night and his wife was to follow him, leaving Chicago Sunday night. The warden and his family occupied the east part of the third floor of the Administration building, and the family consisted of the warden, Mrs. Allen, Anna J. Emery, the housekeeper, Catherine Allen, aged eighteen years, and John Allen, aged nineteen years, children of a former marriage, and Harold Larkin, aged twenty years, a friend of John Allen. A number of convicts were employed in various duties on that floor, all of whom, except Campbell, left the building before eight o'clock, at which time Mrs. Allen, Miss Emery, Catherine Allen, John Allen and Harold Larkin went down-town in the city of Joliet. Miss Emery went to her home and remained there over night. The others went to two moving picture shows and came back to the Administration building about 10:45 o'clock, when Mrs. Allen directed Campbell to prepare a lunch for the party, who then went into the living room and danced to the music of a graphophone. It was the duty of Campbell to call the different members of the family every morning, and he had written down a call for each one, leaving the hour blank. Catherine Allen

filled in the blanks so that John Allen and Harold Larkin
were to be called at 8:30 and Mrs. Allen and Catherine
at nine o'clock. The calls were laid upon the pad on the
housekeeper's desk and Campbell saw and understood them.
After the dancing Mrs. Allen went to her room and Camp-
bell served the lunch about 11:20, after which Catherine
Allen, John Allen and Larkin went up-stairs to the fourth
floor to their bed-rooms at about 11:40 or 11:45 o'clock,
and Campbell left the building at 11:50 and went to a cell
house. The sleeping room of Mr. and Mrs. Allen was in
the southeast corner of the building. There were two single
beds in the room, with the heads of the beds at the east
wall. There was a window in the east and one in the south
and a fire-place on the west side. Mrs. Allen usually oc-
cupied the south bed and Mr. Allen the north one. There
was a call bell outside of the room with a push button over
each bed, operated with a battery on what is known as a
grounded circuit. One call was for Campbell and other
calls were for other servants. About 6:25 Sunday morning
the bell began ringing and rang continuously, and it was
then discovered that smoke was coming from the bed-room.
An alarm was given and an effort was made by the men
on the floor to extinguish the fire by hose, but it did not
reach and the fire department put out the fire, which was
extinguished by 6:37 o'clock. The ringing of the bell was
caused by the burning off of the insulation of the wires
hanging over the bed. When the room was entered it was
full of smoke, but the men broke the east window and
raised or broke the south window, and when the smoke was
cleared away the body of Mrs. Allen was found on the
north bed, burned beyond recognition. Her ears and nose
were burned off, her arms were drawn up toward her face
and the hands burned to a crisp, so that the bones protruded.
Her hair was burned off except on the back, where it was
embedded in the pillow. The feet and legs were drawn up,
but the bed covers had saved the feet and legs from being

burned as badly as the body. The pillow was soaked with blood, and blood was running from her right ear and nose, and her tongue protruded an inch from her mouth and her teeth were embedded in it. There had been a criminal assault upon her person, the right side of her skull was fractured, and on the bed there were numerous broken pieces of a gallon earthen jug in which alcohol was kept in a cabinet near the room and which was three-fourths full of grain alcohol two days before the fire. There was an immediate investigation and an inquest was held by the coroner, at which the persons about the building were examined as witnesses. Campbell was indicted for the murder, and his trial resulted in a verdict of guilty and a death sentence. After six reprieves to enable him to present the record to this court the record has been filed and the cause argued and submitted for a decision.

The Administration building was of stone, practically square, facing south, and five stories high, counting the basement, and on each side there was a wing extending from the north part as a cell house for prisoners. The second floor was used for offices, reception rooms, visitors' rooms and a guard hall, and at the north and west gates of the guard hall a turnkey was always on duty. On the second floor there was a corridor running north and south through the center of the south half, and a stairway on the east side of that corridor led to the third floor. At the west end there was an elevator running up to the fifth floor, connecting with each floor, and there was also a stairway. The third floor was divided about midway north and south by a corridor running from east to west, and at the east end of the corridor there was a flight of stairs beginning on that floor and leading up to the fourth and fifth floors. From the south side of that corridor, about the middle of the building, a corridor led south to the front of the building, and the stairway from the corridor on the second floor landed in that corridor. The warden occupied

for his private use practically the east part of the third floor, consisting of a dining room in the center at the north end, a living room, bed-room, den, bath room, housekeeper's office, kitchen and butler's pantry, and there was a linen room opening to the west in the open space in front of the dining room. The bed-room occupied by Mr. and Mrs. Allen had a door on the west leading into the living room and a door on the north into a passageway leading to the east and west corridor, and these doors were always kept locked. North of the bed-room was what was called the den, and the way to the bed-room was through said passageway into the den and through the den into the bed-room. The warden also had some rooms on the fourth floor, on the east side of the building, and the means of access to them was by means of the stairway, which started at the third floor on the east side. The station of the defendant was on the third floor, between the east stairway and the den. There were about twenty-five convicts employed in the Administration building who were confined in the penitentiary on various charges of larceny, arson, burglary, manslaughter or murder, and seven of these convicts were employed on the third floor. James Larkin was the keeper who had charge of the servant force on that floor, and at 5:40 on Sunday morning he admitted to the building those seven men and four others who worked on the fourth and fifth floors. The seven admitted to the third floor were Campbell, the defendant; Edwards, the waiter; Jones, the cook; Gukowski, the baker; Johnson, the pantry man; and Simpson and Sam Cohen, the linen room men. Larkin's station on the third floor was such that he could watch the stairway and prevent anyone from coming to that floor, and he went to his chair and sat there until about 5:55, when he went to the fourth and fifth floors, where he saw the other four convicts, and came back to the third floor about 6:05 or 6:07. He then went through the office, pantry, kitchen and dining room and saw the other men, and then came

back and sat in his chair until he was called to breakfast, and had just sat down to breakfast when the bell began ringing.

In the investigation immediately after the homicide the defendant made a statement and he testified at the coroner's inquest, and the statement taken down by the stenographer and the testimony at the inquest were admitted in evidence against the objection of the defendant. It is argued that the ruling was error, because an involuntary confession can not be admitted against a defendant, which is true. (*People* v. *Buckminster,* 274 Ill. 435.) There was nothing in the statement or testimony which could be called a confession, which is a voluntary declaration by a person charged with crime of his agency or participation in the crime. (*Johnson* v. *People,* 197 Ill. 48; *Michaels* v. *People,* 208 id. 603.) But if there was anything in the statement which could be used to the prejudice of the defendant it could only be excluded because it was not voluntarily given. There was an examination by the court of the circumstances under which the statement was made and the testimony given, at which defendant testified that he had been told that if he would confess he would be recommended to mercy or would be imprisoned in an insane asylum, and that he was confined and fed on bread and water and was told that it was because he would not confess that he had killed Mrs. Allen. He did not, in fact, make any confession but denied any participation in the crime, and his statement was proven false. He was taken to a room above the solitary, which was larger and better ventilated, and fed as usual, and the purpose was to protect him from threatened violence of other convicts and not to extort a confession from him. Neither when the statement was made nor at the inquest was there any promise or threat, and the questions asked were voluntarily answered, without compulsion, intimidation or coercion of any sort. All who were about the building were interrogated to ascertain what they knew;

and while it was well known that the defendant had been in the bed-room that morning and was under suspicion, he had not been arrested and no charge had been made against him. On the examination the court excluded the answer of the defendant ·that he would not have testified before the coroner if he had known he could have refused, and an objection to the question as to whether he testified voluntarily and of his own free will was sustained. There was no error in either ruling. The question whether the statements were freely and voluntarily made depended upon the circumstances and what was said and done at the time, (*People* v. *Gukouski,* 250 Ill. 231,) and the defendant was not entitled to make evidence by testifying to what he would have done if he had known more, or the legal question whether the statement was voluntary. The court did not err in admitting the defendant's statement and testimony.

It is next contended that the court erred in refusing the motion of the defendant to have the body of Mrs. Allen exhumed. The motion was supported by the affidavit of the defendant that the evidence failed to show conclusively the cause of the death of Mrs. Allen and that the extent and location of the fracture of the skull could be determined by a post-mortem examination, and the motion was that the court quash the inquest already held and the verdict and direct the coroner to cause the body to be exhumed and a post-mortem examination be made and an inquest held, to the end that knowledge of the extent of the fracture might be obtained. The facts as to the fracture and condition of the body had then been proved and nothing further appeared, but the defendant afterward introduced the testimony of an expert in post-mortem examinations, who testified that by sawing off the top of the head the extent of the fracture could be positively learned, and he tendered his services for the purpose. The trial occurred four or five months after the death and burial of Mrs. Allen, and that a murder was committed was not open to question.

The only possible inquiry was as to who committed the murder, and nothing would have been gained by a more particular examination of the fracture of the skull to see how far it extended. Whether the cause of the death was the fracture or the burning, both of which occurred at practically the same time, is of no importance. It is inconceivable that one person could have killed Mrs. Allen by fracturing her skull and another killed her by burning her to death. Exhuming the body for the purpose stated in the motion would have amounted rather to a desecration than a judicial investigation. Leaving out of view the power of the court to quash the inquest and order the exhuming of the body, there was no reasonable ground for the motion and the court did not err in denying it. There was no error in any other ruling of the court.

The defendant testified at the trial, and his testimony on the trial and at the inquest and the statement made upon the investigation were substantially the same, with minor differences, only. In substance they were, that when Mrs. Allen and the others came home about eleven o'clock he was the only help on the third floor; that he got a lunch for them; that Mrs. Allen went to her room and the others went up-stairs about five minutes to twelve, leaving no one on the floor with Mrs. Allen but Lawrence Ryan, a deputy warden, and himself; that he went to the east cell house for the night and came out about twenty minutes to six and came up to the third floor with the others and Larkin, a keeper; that the calls were written down; that he took the Sunday newspapers, the *Tribune, Herald* and *Examiner,* and got mineral water out of the ice-box and went to the door of Mrs. Allen's room; that he shook the door knob, and she said, "All right," and he went in; that she asked him if the papers had come, and he said they had but the *Joliet Herald* had not come yet; that she said that when John (the barber) came over to have him fix the boys up first, and she was to have a massage and hair wash and was

not going to get up until nine o'clock; that she was in bed and undressed; that he laid the Sunday papers on the side of the bed and put the mineral water in the thermos bottle; that there was some fire in the fire-place on the west side of the room and he had kindling in a basket, but he turned the sticks over and there was some fire and they started up and he came out and shut the door; that he went into the bath room, put salt water in the tub, spread a rug in front of the tub and let down the trap-door in front of the shower bath. He said that it was a habit of Mrs. Allen to read the papers every morning in bed. He said that when he came from the cell house on Sunday morning with the other house servants he had the key to the linen room in his pocket, and he went straight to the den and got the other key, which was kept on the table in the den, and gave it to Johnson to go into the other rooms, which he had kept locked; that he put the alcohol jug in the locker the Saturday before the fire, about the time they packed the warden's grip to send to Chicago, and Mrs. Allen used the alcohol at that time to make a lotion of witch hazel and alcohol to put in the grip; that the jug was about three-fourths full of alcohol and was kept in a little cabinet between the den and bath room; that during the three or four months he had been there Mrs. Allen had four different times brushed alcohol over her arms and hands with a feather like a turkey wing from her hat and then set it on fire to singe off the hair; that he, alone, was present when it was done and held the jug for her; that he told the housekeeper, Miss Emery, and Edwards, the waiter, of that practice on the part of Mrs. Allen; that Mrs. Allen also used alcohol for rheumatism in her shoulder; that she would soak a towel and put it on her shoulder and cover it with an electric pad attached at the writing desk; that when he came out of the bed-room he unchained the dog and went out with him on the lawn, and when he came back

he was told of the fire and went up-stairs and was told that Mrs. Allen was not in the room.

It is contended that the People could not offer testimony of the falsity of any of these statements upon the ground that they could not impeach their own witness, and when they offered in evidence his testimony before the coroner and the statement before the inquest he became their witness. There are limitations to that rule, but the rule does not apply to this case in any manner. The defendant was never made a witness for the State, and the law did not protect him against proof of the falsity of the statements made for the purpose of explaining away suspicious circumstances against him. 12 Cyc. 429; *People* v. *Arnold,* 43 Mich. 303; *Commonwealth* v. *Donovan,* 99 Mass. 423; 2 Bishop's New Crim. Proc. sec. 1072.

Mr. Allen was accustomed to have the morning papers and water brought to him by Campbell every morning and to read the newspapers in bed, but he testified that Mrs. Allen never read the papers in bed, and that he told the defendant the papers were for his personal use and when he was not there to lay them on the table in the den. Miss Emery and Edwards both denied that the defendant ever told them of a practice of Mrs. Allen's to put alcohol on her hands and arms to singe off the hair. Mr. Allen knew nothing of such a practice on the part of his wife. But it is utterly impossible that the fire could have been caused by such an act. Mrs. Allen had one electric pad, and that was in the cabinet after the fire. The defendant testified that the south window was open when he was in the room, with a screen in front of it, and when the room was entered after the fire the window was closed, apparently so that the fire would not be seen. It would be inconceivable that Mrs. Allen would lie in bed and be burned up if some part of the bed took fire from the use of alcohol in that way when any human being under like circumstances would have jumped out of bed. It is beyond question that she was in-

sensible at the time of the fire, and the fact of her protrud-
ing tongue, with her teeth embedded in it, showed that she
had been rendered insensible, probably by choking.    The
protruding tongue, the embedded teeth, the fractured skull
and the broken jug exclude any such fanciful theory as
that the death of Mrs. Allen was caused by accident.    The
defendant was in the bed-room according to his own state-
ment, and it was also proved by the fact that he had the
Sunday morning papers and that they were in the room
after the fire, not where he said he placed them but lying
on the floor at the foot of the bed, at the northwest corner.
His testimony concerning the fire in the fire-place was con-
tradicted by evidence that the ashes were cold and there
was no sign of a fire there.    Campbell's presence in the
room was contrary to instructions.    He had the written di-
rections specifying when he was to call each one of the fam-
ily, and Mrs. Allen was not to be called until nine o'clock.
Mrs. Allen was alive and well, according to the defendant's
own testimony, when he went into the room and was dead
and her body burned up at 6:37.    *Rigor mortis* had set in,
but the expert for the defendant testified that that might
occur at any time after death, and he had observed that in
cases of burning it appeared at once.    The evidence posi-
tively and conclusively excluded any theory that any other
person could have been in the bed-room that morning.
John Allen and Larkin were in bed on the fourth floor, both
by their own testimony and the testimony of another wit-
ness.    They were awakened by the men running around
and the noise of the bell ringing and got up, and, looking
into Catherine's room and finding it empty, ran down to
where the fire was.    Catherine Allen slept on the fourth
floor in a room over the den, and was awakened the next
morning by the noise and got up and knocked on her
brother's door and not getting any response went down-
stairs.    Every person on the floor was accounted for by
credible and unimpeachable testimony.    The defendant was

the only one who had access to the bed-room and the only one who went in there.

The principal argument of counsel to exonerate the defendant is that there was not time for the commission of the crime between the time when the defendant began his duties and the time when he came from the room and went out with the dog. Campbell said it was about ten minutes to six when he went to the bed-room, but he had no timepiece and figured the time by what he had done before he went to the bed-room. He came from the direction of the bed-room some time about 6:10 and went out of the building from 6:10 to 6:15. Mrs. Allen was killed that morning after 5:45 and before the fire was discovered, and that fact being certain, speculations as to the time required lead to nothing. The defendant had more time than anyone else could have had because he was in the room a part of that time. The fire was discovered about 6:25, but it had been burning for some time before that. The man in charge of the fan in the attic went there about 6:20 and noticed smoke and went to the motor to see if there was any heating but found there was not, so that the fire had been burning long enough so that smoke had gone up into the attic at that time. No rational person could believe that after the defendant left the bed-room and before the fire some unknown person entered the room, choked Mrs. Allen to insensibility, committed a criminal assault, procured the alcohol jug from the cabinet in the passageway, poured the alcohol over her body, broke the jug in fracturing her skull, and set the alcohol afire, unobserved by anyone. The defendant was an applicant for a parole and his application had been continued several times. The parole board was to meet on Monday, the 21st, and Mrs. Allen had assisted him to some extent in reference to a parole, for which he would naturally have some gratitude, but there was evidence that he had said he was going to get off the job whether he was paroled or not; that Mrs. Allen made him

282 — 40

run his legs off and was too hard to please. The fact, however, that he entertained feelings of gratitude toward Mrs. Allen for her kindness is not inconsistent with a belief that in the situation and under the conditions existing in the bed-room on that Sunday morning, in the stress and sway of an overmastering passion, nature harked back to primal instincts, and in the recession gratitude to the one who had befriended him, regard for the law, the unspoken pledge. implied by honor from the liberty allowed to him, and even pity for his helpless victim, had no restraining power and the crime was committed. That is the only conclusion that can be drawn from the evidence, which proved defendant guilty beyond all reasonable doubt and to a moral certainty.

The judgment is affirmed, and the clerk of this court is directed to enter an order fixing the period between nine o'clock in the forenoon and four o'clock in the afternoon of the twelfth day of April, 1918, as the time when the original death sentence entered in the circuit court of Will county shall be executed. A certified copy of such order shall be furnished to the sheriff of Will county.

*Judgment affirmed.*