FIFTH DIVISION

                                                   March 9, 2001                                                 

1-98-0710

THE PEOPLE OF THE STATE OF ILLINOIS)          Appeal from the 

                                   )          Circuit Court of 

          Plaintiff-Appellee,      )          Cook County

                                   )

      v.                           )

                                   )

RICARDO JOYA,                      )          Honorable 

                                   )          Marcus R. Salone, 

          Defendant-Appellant.     )          Judge Presiding.

           
MODIFIED UPON DENIAL OF PETITION FOR REHEARING
       

PRESIDING JUSTICE QUINN delivered the opinion of the court:

Following a jury trial, defendant Ricardo Joya was convicted of first degree murder and attempted first degree murder and sentenced to 30 years' imprisonment.  On appeal, defendant contends that: (1) the trial court abused its discretion in allowing the State to introduce evidence of defendant's alleged gang affiliations; (2) the trial court abused its discretion in admitting defendant's statement where he spoke only Spanish and could not read, speak or write in English; (3) the State failed to prove him guilty beyond a reasonable doubt; (4) he was denied his right to a fair trial because he was tried before a judge who he named in a motion for 

substitution of judge; and (5) he was denied effective assistance of counsel.  As we reverse this case based on our resolution of the first issue, we need only further address the second and third issues. 

The following facts are relevant to this appeal.  Defendant's conviction arose from the fatal shooting of Armando Gomez outside of the Mi Tenampa bar and restaurant at 7100 North Clark Street in Chicago.  Prior to trial, defendant filed a motion to suppress and alleged, among other things, that the written statement he signed was in English and that it was not read to him in Spanish.  Defendant further alleged that he signed the statement without reading it or having it read to him because he was coerced to do so.  After hearing testimony from Detective Richard Abreu and defendant, the court found that the State met its burden and denied the motion.  The motion to suppress was heard by Judge Maki.  After this opinion was issued, defendant filed a petition for rehearing asking this court to address the issue of his motion for substitution of judge.  As the motion to suppress was heard and ruled on by a judge other than the one named in the motion for substitution, we choose not to address this issue. 

Defendant also filed a motion 
in
 
limine
 to prohibit the State from introducing at trial any reference to defendant's gang membership and to redact mention of gang membership in defendant's statement.  The State filed a written response arguing that the gang-related evidence showed that defendant and his codefendants acted with a common purpose and design.  The trial court denied defendant's motion. 

At trial, Felipe Gomez testified that on July 4, 1993, he, along with his brothers Armando and Jose, and their friend Arturo Ramirez, arrived at the Mi Tenampa restaurant at approximately 8 p.m. after spending the day attending various Mexican rodeos.  Felipe Gomez testified that after dinner, between 10 and 10:30 p.m., the group went to the Mi Tenampa Bar and ordered drinks.  At approximately 1:30 a.m., Felipe attempted to leave the bar with his brother Armando.  Before he left the bar, Felipe saw four people in front of the bar door.  Felipe identified one of those persons as defendant.  Once outside, Felipe looked for Jose and Arturo in order to leave.  Jose Flores asked Felipe what he was looking at.  Felipe replied that he could look wherever he wanted.  Flores then asked Felipe if he was looking for trouble, pushed him and then swung at him with a closed fist.  Felipe swung back but did not make contact.  Felipe testified that Flores put his hands by his waist and said, "[a]ll of you guys are going to die."  After hearing this, Felipe and Armando walked quickly toward the bar door.  Defendant, Jose Flores, Andres Rubio and Pedro Joya followed them.    Felipe tried to pull the door open to ask for help.  After he was unable to open the door, he turned around and saw Pedro point a silver gun at him and fire two shots.  Felipe moved quickly and was not hit.  Felipe saw defendant, Flores and Rubio holding and beating Armando.  As Armando said "don't hit me," Felipe tried to run to the restaurant door.  Rubio caught Felipe and they struggled.  Felipe looked back and saw defendant and Flores on each side of Armando.  Armando was on his knees and said "don't fire" when Pedro fired a shot.  Felipe watched as Armando fell to the ground.  Armando died from gunshot wounds to his chest.  Defendant and his brother Pedro fled to Sioux City, Iowa.

Felipe later gave the police a description of defendant, Pedro, Rubio and Flores.  During the trial, the State then showed Felipe a photograph, which Felipe identified as defendant. 

Arturo Ramirez testified that he was with Felipe, Armando and Jose on July 4, 1993, and that after a day at the rodeo they went to Mi Tenampa for dinner, followed by drinks and dancing at the bar.  At approximately 1:30 a.m., three men approached Arturo as he was standing on the dance floor.  One of the men punched Arturo in the nose.  Arturo did not retaliate.  Arturo identified the one who hit him as defendant. Arturo testified that he had never met defendant before that evening.  Arturo also identified Andres Rubio and Jose Flores as the other two men who approached him that morning.

Arturo testified that the bar owner grabbed defendant so that he would not hit Arturo again and the three men were escorted out of the bar.  While Arturo was inside the bar, he heard three gunshots and hit the floor.  Felipe Gomez entered the bar and said that his brother had been shot. 

On cross-examination, Arturo was asked if he told the officers at the scene that there were only two offenders involved, rather than three.  Arturo replied that he told the officer that three men were involved.

Juan Ramirez, owner of the Mi Tenampa Restaurant and Bar, testified that on July 4, 1993, at approximately 1:30 a.m., he was standing next to the dance floor when he saw defendant strike Arturo.  Ramirez had not met Arturo before that evening, but had known defendant as a regular customer of his restaurant and bar. After Ramirez asked defendant to leave, a doorman escorted defendant out of the bar.  Three to five minutes after defendant was escorted from the bar, Ramirez heard gunshots. Later that night, Ramirez identified defendant from a photo array.  On July 24, 1993, Ramirez identified defendant in a lineup at the police station.  Ramirez also testified that, two or three months prior to the shooting, defendant told him that he was a member of the Viking street gang.  Ramirez admitted that the first time he told anyone about this conversation was the morning of the trial. 

Officer Anthony Powell testified that he arrived after the shooting and found the victim lying on the ground.  Powell called for an ambulance and assistance.  To Powell's knowledge, no knives were involved in the incident and none were recovered from the scene.  Powell further testified that his report does not specify the number of offenders involved because he did not inquire as to whether there were more than two offenders when he spoke with Felipe Gomez. 

Detective Richard Abreu, who speaks Spanish, testified that on July 6, 1993, he conducted a follow-up investigation of the murder.  Abreu returned to the Mi Tenampa bar and spoke with the owner, Juan Ramirez, and showed him a photo array of eight or nine photographs containing defendant's photograph.  Ramirez identified defendant from the photo array.  

On July 9, 1993, Abreu contacted the Sioux City police department and informed them that there were outstanding warrants for the arrest defendant and the other offenders. That same day, the Sioux City police department contacted Abreu and informed him that defendant and Pedro were in custody.  On July 24, 1993, defendant and Pedro were brought back to Chicago and later that day, Felipe and Juan Ramirez each identified defendant, Pedro and Rubio from a lineup. 

Later that evening, Abreu interviewed defendant in Spanish and read his 
Miranda
 rights to him in Spanish from a preprinted form.  At approximately 11:30 p.m., when the assistant State's Attorney arrived, Abreu acted as interpreter.  Abreu testified that he had been used as an interpreter for interviews with hundreds of witnesses and defendants.  Abreu advised defendant of his rights  and translated the assistant State's Attorney's statements.  The assistant State's Attorney told defendant that he was an attorney, but not his attorney, and asked him how he was treated.   Later that night, the assistant State's Attorney gave defendant the option of giving a handwritten statement, a court-reporter statement, or no statement at all.  Defendant chose to give a handwritten statement.  Defendant, the assistant State's Attorney, and Abreu each signed the page with defendant's 
Miranda
 warnings before defendant's statement was taken.

Abreu testified that whenever the assistant State's Attorney had a question, Abreu would translate the question to Spanish for defendant, defendant would respond in Spanish and Abreu would translate defendant's response back to English for the assistant State's Attorney.  After the assistant State's Attorney finished writing defendant's statement, he read it aloud and Abreu translated it to Spanish for defendant.  Defendant was again read his 
Miranda
 rights, which Abreu translated into Spanish.  After making two corrections to the statement, defendant initialed each page.        

On cross-examination, Abreu testified that he was not trained in the different dialects of Spanish, but that at no time were there any communication problems between him and defendant.  

Assistant State's Attorney Joseph Magats testified that on July 24, 1993, he was working in the felony review unit and interviewed defendant.  Magats spoke to defendant in English with Abreu acting as interpreter.  After he wrote defendant's statement in English, he read it and Abreu translated what he read into Spanish.  Magats testified that defendant was looking at the statement while Magats read it.  Defendant was asked if he wanted to make any corrections or changes and then defendant signed each of the pages.

At trial, Abreu testified to defendant's statement before the jury.  In the statement, defendant admitted that he, his brother Pedro, and friends Jose Flores and Andres Rubio are members of the Ashland Vikings street gang.  Defendant further admitted that he beat up a customer at the bar on July 4, 1993.  After he was thrown out of the bar for the fight, defendant stated that he wanted to beat up the person again and decided to wait for him outside the bar. Defendant stated that he and Flores walked up to the two men as they walked out of the bar and Flores told them that he was going to kill them.  According to defendant's statement, he had seen Pedro with a silver .38-caliber handgun.  Defendant stated that he turned to his brother Pedro and asked him if he still had the gun.  Defendant then told Pedro to get the gun from the car.  Defendant further stated that he did not see any weapons in the hands of the two men.  As the two men began to walk away, defendant, Flores and Rubio began to follow them.  Pedro came from across the street with the gun in his hand and defendant stated that he saw Pedro fire the gun four times at the two men.  After Pedro fired the gun, he ran down Clark Street and defendant went home.   

Defendant further admitted that he and Pedro decided to go to Iowa because they knew the police were looking for them.  Defendant then said that he was not threatened or promised anything in return for his statement and that he had been treated well by the police and the assistant State's Attorney.  Defendant also said that Abreu read all three pages of his statement aloud in Spanish and that he could make corrections to the statement.  

Subsequently, the jury found defendant guilty of first degree murder and attempted first degree murder.  Defendant's timely appeal followed.   

Defendant contends that the trial court abused its discretion in allowing the jury to hear testimony regarding defendant's alleged gang affiliation. 

Evidence is admissible if it is relevant to an issue in dispute and its probative value is not substantially outweighed by its prejudicial effect.  
People v. Gonzalez
, 142 Ill. 2d 481, 487, 568 N.E.2d 864 (1991). Although gangs are regarded with much disfavor, it is generally held that evidence indicating the defendant was a gang member or was involved in gang-related activity will be admitted if it provides a motive for an otherwise
 
inexplicable act.  
People v. Smith
, 141 Ill. 2d 40, 58, 565 N.E.2d 900 (1990); 
People v. Resendez
, 273 Ill. App. 3d 751, 758, 652 N.E.2d 1357 (1995).  However, such evidence is admissible only where there is sufficient proof that such membership or gang activity is related to the crime charged.  
People v. Strain
, No. 88007 (November 16, 2000).  Evidence of gang membership may be excluded if its probative value is outweighed by its prejudicial effect.  
People v. Maldonado
, 240 Ill. App. 3d 470, 475, 608 N.E.2d 499 (1992).  A trial court's decision to admit gang evidence will not be overturned on appeal absent a clear abuse of discretion.  
Gonzalez
, 142 Ill. 2d at 489-90 (1991); 
People v. Colon
, 162 Ill. 2d 23, 30, 642 N.E.2d 118 (1994).

Defendant asserts that the State failed to link the statement that he was a "Viking" to any event that occurred the night of the shooting.  Defendant further argues that even if he admitted  membership in a gang, this evidence does not establish a motive for why his brother shot the victim.  The State responds that evidence of defendant's gang membership was relevant to show that defendant and his fellow gang members shared a common purpose or design and relies on 
People v. Jones
, 259 Ill. App. 3d 905, 632 N.E.2d 23 (1994), to support its contention.  

In 
Jones
, defendants were convicted of first degree murder and two counts of attempted first degree murder.  Defendants shot three victims at a motorcycle club and there was witness testimony at trial that defendants were not motorcycle club members but, instead, were members of the Vice Lords street gang.  There was also witness testimony that one of the defendants had a prior altercation with one of the victims before the shooting.  On appeal, defendants argued that the trial court improperly admitted evidence of their gang affiliation because there was no indication that such gang affiliation was the reason for the shooting.  
Jones
, 259 Ill. App. 3d at 910.  In fact, defendants argued that the shooting could be explained solely by reference to the prior altercation between one of the defendants and one of the victims; therefore the gang evidence was irrelevant.  This court held that defendants' gang affiliation was relevant to explain defendants' conduct.  
Jones
, 259 Ill. App. 3d at 911. This court specifically held: "Jones' actions were interwoven with those of Lewis.  The fact that Lewis joined Jones in shooting members of the motorcycle club can be explained by the fact that Jones and Lewis belong to the same gang."  
Jones
, 259 Ill. App. 3d at 912. 

We find 
Jones
 to be distinguishable on its facts.  In 
Jones
, several witnesses testified that the defendants and others were wearing the bills of their hats to the left, which is a commonly known sign of membership in the Vice Lords street gang.  
Jones
, 259 Ill. App. 3d at 907.  Witnesses also stated that they recognized several members of the Vice Lords in the motorcycle club that night.  Most importantly, as one of the defendants ran back into the club with his gun, a witness heard someone yell, "All Vice Lords leave."  
Jones
, 259 Ill. App. 3d at 908.  After that statement, the witnesses observed the people wearing their hats to the left running out of the club as the gunshots began.

In our case, the only evidence that there was any connection between defendant's gang membership and the shooting of Armando was Juan Ramirez' testimony that, two or three months prior to the shooting, defendant told him that he was a member of the Viking street gang.  The evidence in this case showed that the incident was a bar fight and there was absolutely no testimony that anyone mentioned gang involvement in the shooting either prior to or after the shooting.  As to the State's argument that the evidence of gang affiliation established a common purpose or design between defendant and his fellow gang members, we note that the shooter, Pedro, was defendant's brother.  The familial relationship between the two is a more reasonable basis upon which to find a common purpose or design.  Further, defendant told Pedro to get the gun immediately before Pedro shot the victim.  This is overwhelming direct evidence that defendant and Pedro acted with a common purpose.  Consequently, any inference that their mutual gang membership supported the State's theory that they acted in concert was cumulative and unnecessary.  We find that the evidence of gang membership in this case was not related to the crime charged and that if it had any probative value at all, such value was greatly outweighed by its prejudicial effect.  We find that the trial court abused its discretion in admitting the evidence of defendant's gang membership and, for this reason, we reverse defendant's conviction and remand this matter for a new trial.   

Defendant also contends that the trial court erred in admitting defendant's statement into evidence.  As this issue will likely arise during the retrial, we will address it.  Defendant asserts that the statement written by the assistant State's Attorney in English should not have been introduced into evidence where defendant had no opportunity to select an interpreter or for the court to appoint an interpreter for him.  Defendant argues that Detective Abreu did not act as a standard interpreter because he did not write down the questions in Spanish, he did not write down defendant's answers, and he failed to write out defendant's alleged statement in Spanish for defendant to read and then sign.  The State responds that defendant has waived consideration of the issue upon appeal by failing to object to the admission of the statement at trial and failing to include it in his posttrial motion.

Both an objection at trial and a written posttrial motion raising the issue are necessary to preserve an issue for review and failure to do both results in a waiver of the issue on appeal.  
People v. Enoch
, 122 Ill. 2d 176, 186, 522 N.E.2d 1124 (1988); 
People v. Hardaway
, 307 Ill. App. 3d 592, 607, 718 N.E.2d 682 (1999).  A review of the record establishes that defendant did not object to the admission of the statement at trial.  Furthermore, defendant's posttrial motion includes an entirely different argument advocating the suppression of defendant's statement.  Defendant's posttrial motion argues that "the court erred in allowing the prosecutor to circumvent the defendant's right to remain silent by arguing that the statement handwritten by another prosecutor was '...through his own words....'"   We further note that defendant has not argued that defense counsel rendered ineffective assistance by failing to object to the introduction of the statement during trial.  As defendant has raised this issue for the first time on appeal, we hold that the issue of the admissibility of defendant's statement is waived.

Even if we were to consider defendant's argument, it would be rejected.  In 
People v. Grisset
, 288 Ill. App. 3d 620, 681 N.E.2d 1010 (1997), the defendant also attacked the admissibility of his confession based upon grounds of hearsay.  This court held, "[t]he hearsay exception for a criminal defendant's voluntary confession is firmly rooted in the law and comports with the substance of the constitutional protection of the confrontation clause of the sixth amendment.  
Grisset
, 288 Ill. App. 3d at 630.  Where a defendant challenges the admissibility of his confession through a motion to suppress, the State has the burden of proving that the confession was voluntary by a preponderance of the evidence.  725 ILCS 5/114-11(d) (West 1998); 
In re G.O.
, 191 Ill. 2d 37, 49, 727 N.E.2d 1003 (2000).  This concept of voluntariness includes proof that the defendant made a knowing and intelligent waiver of his privilege against self-incrimination and his right to counsel.  
People v. Reid
, 136 Ill. 2d 27, 54, 554 N.E.2d 174 (1990).  The determination is to be made based upon the totality of the circumstances, rather than any one controlling factor.  
Reid
, 136 Ill. 2d at 54-55.  Among the factors to be considered in determining whether a confession or waiver of rights is voluntary are the defendant's mental ability, familiarity with the English language, age, education and experience.  
People v. Bernasco
, 138 Ill. 2d 49, 365, 562 N.E.2d 958 (1990).  A reviewing court will give great deference to a trial court's findings of fact, reversing them only when they are against the manifest weight of the evidence; however, we review the issue of voluntariness of the confession 
de
 
novo
.  
In re G.O.
, 191 Ill. 2d at 49.

In the instant case, the translator, Detective Abreu, testified to, defendant's statement.  Detective Abreu is a native Spanish speaker with 24 years of experience translating for various divisions of the Chicago police department and the federal Drug Enforcement Agency.  Abreu was cross-examined fully regarding his translation of defendant's statement and the substance of defendant's statement.  Abreu also specifically discussed the process of obtaining the statement from defendant, which included giving defendant his 
Miranda
 rights from a preprinted form written in Spanish which defendant signed.  Abreu and the assistant State's Attorney both testified that as defendant gave his statement in Spanish, Abreu translated it to English and the assistant State's Attorney wrote the statement in English. Once the statement was written, Abreu read the entire statement "word for word" to defendant in Spanish and only then did defendant sign it.  Defendant testified at the motion to suppress that Abreu read the written statement to him in Spanish but that it contained things he had never said.

In 
People v. Villagomez
, 313 Ill. App. 3d 799, 730 N.E.2d 1173 (2000), this court held that, under an identical fact pattern, the handwritten statement in English of a defendant who spoke only Spanish was admissible at trial where the person who translated the defendant's statement to the assistant State's Attorney testified to the taking of the statement.  
Villagomez
, 313 Ill. App. 3d at 808-09.  In that case, the assistant State's Attorney published the written statement to the jury.  In the instant case, the translator, Detective Abreu, published it.  As a practical matter, the method of publication is better in this case than in 
Villagomez
.  

The holding in 
Villagomez
 followed substantial precedent. In 
People v. Gukouski
, 250 Ill. 231, 95 N.E. 153 (1911), our supreme court addressed a fact pattern almost identical to ours.  There, three suspects were arrested for murder and were interviewed.  Two of the suspects spoke only Polish.  Two Polish-speaking police officers interviewed the suspects.  One of the police officers testified that the interviews were conducted "in Polish, and that he translated their statements into English and wrote them down.  After completing the statements he translated them, sentence by sentence, into the Polish language to the parties, and they were then signed by the parties, respectively."  
Gukouski
, 250 Ill. at 234-35.  The defendants testified that, while they voluntarily spoke to the police, the statements were not taken down accurately or that they did not know the statements contained certain matters.  The supreme court held, "[t]he circumstances under which they were made and signed entitled them to be admitted in evidence.  The value of confessions as evidence depends upon the circumstances under which they were made.  The jury had all the circumstances before them, and the weight and credit to be given to the oral confession of Nogawischi and the written confessions or statements by Krolikowski and Gukouski were matters for them to determine."  
Gukouski
, 250 Ill. at 235.    

Similarly, in 
People v. Teran-Cruz
, 272 Ill. App. 3d 573, 650 N.E.2d 663 (1995), this court faced a fact pattern almost identical to that before us and that in 
Villagomez
.  There, the trial court had suppressed the Spanish-speaking defendant's confession.  The defendant had testified that he thought the assistant State's Attorney was acting as his attorney.  On appeal, this court reviewed the pertinent case law recited above and applied it to the facts.  This court reversed the suppression of the defendant's confession, including a handwritten statement in English which was taken by an assistant State's Attorney who spoke no Spanish.  
Teran-Cruz
, 272 Ill. App. 3d at 579-80.  

Whenever a witness' or a defendant's statements are not in English, translation is a necessity to make those statements intelligible to the court and the jury.  This is why the statements are translated to English in the first place.  To say that the written statement must be taken in the defendant's own language and 

then translated to the court and jury would not make it any more accurate.  Testimony regarding a confession by a non-English-speaking defendant is admissible because it satisfies the most important requirements of other exceptions to the hearsay rule: (1) it has circumstantial guarantees of trustworthiness; (2) it concerns admissions of a party; and (3) it consists of admissions against the declarant's penal interest.  Of course, the fact that an interpreter is used and, significantly, the fact that the written statement is not intelligible to the defendant are bases upon which to attack the statement's accuracy.  However, if the trial court finds the statement to have been voluntarily made, such statements are admissible.  
Gukuoski
, 250 Ill. at 235.     

Defendant further contends that he was not proved guilty beyond a reasonable doubt.  The State responds that defendant was proved guilty beyond a reasonable doubt based on a theory of 
accountability.  In reviewing the sufficiency of the evidence, a reviewing court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  
People v. Campbell
, 146 Ill. 2d 363, 374, 586 N.E.2d 1261 (1992).  Whether the requisite elements have been proven is a question for the trier of fact, and its findings will not be disturbed on review unless the evidence is contrary to the verdict or so unreasonable, improbable, or unsatisfactory as to create a reasonable doubt of guilt.  
People v. Howry
, 178 Ill. 2d 1, 38, 687 N.E.2d 836 (1998). 

Defendant first asserts that the State's eyewitness, Felipe Gomez, was impeached by Corey Ramirez.  However, the record shows that Corey Ramirez never testified at defendant's trial.  Ramirez gave testimony as a witness in the separate bench trial of Jose Flores.  Matters not properly part of the record and not considered by the trial court will not be considered on review even though included in the record.  
People v. Sheridan
, 51 Ill. App. 3d 963, 965, 367 N.E.2d 422 (1977); 
Avery v. Sabbia
, 301 Ill. App. 3d 839, 843-44, 704 N.E.2d 750 (1998).  As a defendant cannot base an appeal upon evidence which was never presented to the trial court in the context of his case (
People v. Negron
, 297 Ill. App. 3d 519, 697 N.E.2d 329 (1998)), Corey Ramirez's testimony must be disregarded.  Defendant next claims that Felipe was "confused, inconsistent, impeached [and] contradicted" and that Felipe's testimony fails to corroborate defendant's confession that this was a gang-related beating.  As it is the function of the trier of fact to resolve any conflicts in the evidence and to assess the credibility of the witnesses (
People v. Lovelady
, 221 Ill. App. 3d 829, 841, 582 N.E.2d 1217 (1991)), we will not disturb the trier of fact's assessment of Felipe's credibility on review.

Defendant further argues that defendant's statement is uncorroborated by the State's evidence.  
To prove a defendant's guilt based on accountability, the State must show: (1) he aided, abetted, agreed, or attempted to aid another in the planning or commission of the offense; (2) he participated before or during the commission of the offense; and (3) he had the intent to promote or facilitate the commission of the offense.  
People v. Burrage
, 269 Ill. App. 3d 67, 645 N.E.2d 455 (1994); 720 ILCS 5/5-2(c) (West 1992).  "Evidence that the defendant voluntarily attached himself to a group bent on illegal acts with knowledge of its design supports an inference that he shared the common purpose and will sustain his conviction for an offense committed by another."  
People v. J.H.
, 136 Ill. 2d 1, 17, 554 N.E.2d 961 (1990).  Although a defendant's mere presence at the scene of the crime, coupled with flight from the scene, is insufficient to prove accountability (
People v. Reid
, 136 Ill. 2d 27, 61, 554 N.E.2d 174 (1990)), in determining guilt, the trier of fact may consider the defendant's presence during the commission of the crime, a continued close association with other offenders after the commission of the crime, the defendant's failure to report the incident, and the defendant's flight from the scene.  
People v. Johnston
, 267 Ill. App. 3d 526, 534, 641 N.E.2d 898 (1994).

In the present case, each of the four factors support defendant's conviction on an accountability theory. It is undisputed that defendant was present at the scene of the crime, did not oppose the actions of Pedro and did not attempt to intervene to prevent the victim from being shot.  Indeed, in defendant's statement, he admitted that after he hit Arturo in the bar, he wanted to beat him up again and waited outside the bar.  Pedro Joya, Jose Flores and Andres Rubio waited with him.  When Arturo's friends left the bar, Flores told them they were going to kill them.  Defendant also admitted that he told Pedro to get the gun from his car.  Defendant, Flores and Rubio then followed the two men as Pedro retrieved the gun.  After the shooting, defendant maintained close affiliation with Pedro by fleeing the scene and then fleeing to Iowa.  Furthermore, defendant made no attempt to contact the police about the crime in question.  Felipe Gomez' testimony differed from portions of defendant's confession only in that it showed that defendant took an even more active part in the shooting of the victim.  Therefore, we find that all the evidence, as set forth above, provided a sufficient basis for the jury to conclude beyond a reasonable doubt that defendant was guilty of first degree and attempted murder based on an accountability theory.  Accordingly, we find that principles of double jeopardy do not preclude defendant's retrial.  
People v. Shief
, 312 Ill. App. 3d 673, 680, 728 N.E.2d 638 (2000).

Based on the foregoing reasons, the judgment of the circuit court of Cook County is reversed and remanded for further proceedings not inconsistent with this opinion.

Reversed and remanded.

GREIMAN and THEIS, JJ., concur.