2023 IL App (2d) 210655-U
No. 2-21-0655
Order filed May 19, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 99-CF-2461 |
| WILLIE BUCKHANA, | ) ) ) | Honorable David P. Kliment, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE KENNEDY delivered the judgment of the court.
Justices Jorgensen and Birkett concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court did not err in dismissing defendant's second stage postconviction petition, as he failed to make a sufficient showing that he received ineffective assistance of trial and appellate counsel. Therefore, we affirm.

¶ 2    Defendant Willie Buckhana appeals the dismissal of his petition for postconviction relief at the second stage. Defendant argues that the trial court erred in dismissing his amended postconviction petition because it made a substantial showing of ineffective assistance of both trial and appellate counsel. For the following reasons we affirm the judgment of the circuit court.

¶ 3                                    I. BACKGROUND

¶ 4    At approximately 12:30 p.m. on August 16, 1999, Gangster Disciples street gang members Anthony Cooper, Tremayne Thomas, Taiwon Jackson, and Corey Boey were victims of a shooting at an apartment building in Elgin, Illinois, known as "the schoolhouse." Only Boey survived. As a result, defendant and seven other members of the Black Disciples street gang were charged with various criminal offenses.

¶ 5                              A. Procedural Background

¶ 6    In Kane County case No. 99-CF-2069 defendant was charged with unlawful delivery of a controlled substance (720 ILCS 570/401(c)(2) (West 1998)) and unlawful delivery of cannabis (720 ILCS 550/5(d) (West 1998)). These drug offenses allegedly occurred on the same date as the schoolhouse shootings. In Kane County case No. 99-CF-2461 defendant was charged with three counts of first degree murder (720 ILCS 5/9-1(a)(2) (West 1998)), one count of attempt (first degree murder) (720 ILCS 5/8-4(a) (West 1998)), and one count of aggravated battery with a firearm (720 ILCS 5/12-4.2(a)(1) (West 1998)). Boey was the alleged victim in the latter two charges. The State sought the death penalty. The two cases were joined for trial, which was conducted simultaneously with the trial of co-defendant Sherman Williams, but with two separate juries. Defendant was ultimately found guilty on all counts except the charge of attempt first degree murder.

¶ 7    After determining that defendant was eligible for the death penalty, the trial court found sufficient mitigation to preclude imposition of the death penalty, and defendant was sentenced to three concurrent terms of natural life on each of the first degree murder counts. He was also sentenced to concurrent terms of 25 years', 12 years', and 5 years' imprisonment on the aggravated battery with a firearm, unlawful delivery of a controlled substance, and unlawful delivery of cannabis counts respectively. Defendant moved to reconsider sentence, and his motion was denied.

He then timely appealed.

¶ 8    On direct appeal defendant challenged the sufficiency of the evidence regarding his first degree murder and aggravated battery with a firearm convictions, certain jury instructions, certain remarks made by the prosecution, and the trial court's refusal to order several codefendants to answer pretrial deposition questions.

¶ 9    On June 13, 2006, this court affirmed defendant's convictions and sentences in an unpublished order, holding, *inter alia*, that there was sufficient evidence to find defendant guilty as the principal in the murders of Thomas and Cooper, and the aggravated battery with a firearm of Boey. *People v. Buckhana*, Nos. 2-04-0123 & 2-04-0137 cons. (2006) (unpublished order under Illinois Supreme Court Rule 23). We likewise held that there was sufficient evidence to find defendant guilty under a theory of accountability for the three murders and aggravated battery with a firearm, as there was ample evidence that he aided and abetted his fellow gang members in the commission of the crimes. *Id.*

¶ 10    Following the disposition of his direct appeal, defendant filed a *pro se* postconviction petition pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2006)) on August 15, 2007 (file stamped September 7, 2007). On December 16, 2010, appointed counsel filed an amended second-stage petition for postconviction relief. On February 17, 2011, the State filed a motion to dismiss the amended petition. On June 16, 2011, the trial court granted the State's motion to dismiss, and a notice of appeal was filed that day. On June 19, 2011, defendant filed a motion to withdraw his appeal, and his request was granted on July 8, 2011. On April 23, 2015, the dismissal order was vacated, and further second-stage proceedings were held. On April 16, 2021, a second amended postconviction petition was filed, which is the petition at issue in the instant case.

¶ 11    The second amended petition alleged ineffective assistance of both trial and appellate counsel. The petition alleged that trial counsel was ineffective for failing to have various witnesses testify and for unduly influencing defendant not to testify. The petition alleged that appellate counsel was ineffective for failing to challenge the admission of gang evidence on appeal.

¶ 12    On May 17, 2021, the State filed a motion to dismiss the second amended postconviction petition at the second stage. The trial court granted the State's motion to dismiss on November 4, 2021. Defendant was granted leave to file a late notice of appeal.

¶ 13                              B. Evidence Presented at Trial

¶ 14    We previously summarized the evidence adduced at defendant's trial on direct appeal. *People v. Buckhana*, Nos. 2-04-0123 & 2-04-0137 cons. (2006) (unpublished order under Illinois Supreme Court Rule 23). We restate those facts below:

¶ 15    At trial, Elgin police officers testified that they were called to the schoolhouse at approximately 12:30 p.m. on August 16, 1999. Officers found Anthony Cooper lying dead on the second-floor landing of the south stairwell, near the door to apartment 23. Inside apartment 23, officers found Tremayne Thomas lying dead on the living room floor and Taiwon Jackson shot but still alive on a couch. Jackson was later pronounced dead at the hospital. Officers found a fourth shooting victim, Corey Boey, in the back bedroom. Boey was transported to the hospital where he underwent surgery, and ultimately recovered.

¶ 16    Willie "Bay Bay" Fullilove testified pursuant to an agreement with the State. Fullilove explained that he was charged with three counts of first degree murder, one count of attempt first degree murder, and one count of aggravated battery with a firearm in connection with the August 16, 1999, shooting. Fullilove said that he pleaded guilty to aggravated battery with a firearm and received a 20-year sentence. The other four counts remained pending, and unless he provided

truthful testimony at the trials of his co-defendants, the State would pursue those charges. In connection with his guilty plea, Fullilove admitted that he was responsible for the shooting of Corey Boey by accountability. He did not admit to actually shooting Boey.

¶ 17    Fullilove testified that he, defendant, Sherman Williams, Avery Binion, Jeffrey Lindsey, Willie "Pooloo" McCoy, Kewhan Fields, and Chris Smith were members of the Black Disciples street gang. In August 1999, he was 15 years old and living with a woman named Claudia Lopez in apartment 12 at the schoolhouse. At that time Fullilove was selling cocaine. Fullilove was aware that a person nicknamed Gouda (later identified at trial as Quanson Carlisle), and possibly Charles Keys, were selling drugs out of apartment 23 in the schoolhouse. Fullilove explained that the individuals in apartment 23 kept a small safe in apartment 28 containing marijuana, cocaine, and a few pistols. Fullilove stole the safe on August 14, 1999, and he and Byron "Tray One" Lemon broke it open by throwing it over a third-floor railing. The day after he stole the safe, Carlisle and Charles Keys confronted Fullilove about the safe. Fullilove denied stealing it and Keys took a swing at him.

¶ 18    According to Fullilove, defendant, Fields, Lindsey, McCoy, Smith, and Williams came to apartment 12 around noon on August 16, 1999. Defendant gave Fullilove a McDonald's bag containing some cocaine, marijuana, and a digital scale. Fullilove hid the drugs and scale in the "toilet bowl." Williams asked Fullilove if he had a "strap," meaning a pistol. Fullilove told Williams that he did. Fullilove identified State's exhibit number 19 as his .25-caliber semi-automatic Beretta pistol. Fullilove testified that he observed defendant with a .357 magnum revolver in his hand, which he identified as State's exhibit number 2C.

¶ 19    According to Fullilove, defendant said that they were going upstairs to try to "squash" the issue. Before the group left apartment 12 for apartment 23, McCoy, who had hit the buzzer for

apartment 23 on the intercom, indicated that the occupants of apartment 23 were present. Fullilove said that McCoy called Fullilove's cellular telephone with his cellular telephone and told Fullilove to leave his telephone on so that Fullilove could hear the conversation that was about to take place. According to Fullilove, everyone left apartment 12 except him. Fullilove listened on his cellular telephone for a minute or two before the phone went dead. After a few minutes, shots rang out. Fullilove checked on Claudia's children, who he was watching, and who were in the back of apartment 12, and then Fullilove heard a few more gunshots. Next, Fullilove got a call from McCoy who told him to leave the building. Fullilove left the apartment with the children, having put his .25-caliber Beretta inside a Teletubby doll belonging to one of the children. Police officers arrested Fullilove outside of the building, and one of the children picked up the Teletubby doll.

¶ 20    On cross-examination, Fullilove admitted to making five or six false statements to police detectives on August 16 and 17, 1999. Initially, Fullilove gave a false name and date of birth, claimed to know nothing about the shooting, and denied knowing McCoy and Williams. In one or more of the statements that followed his initial statement, Fullilove told the detectives that he fired two shots from the back stairwell when he saw someone come out of apartment 23, and that he ran to the door and threw the gun over the parking lot fence. Fullilove later told the detectives that he did not throw the weapon over the fence but, rather, placed it in a Teletubby doll. Fullilove also admitted that, in the parking lot after the shooting, Eric Matthews and Victoria Cooper were yelling at him and Victoria Cooper said, "You killed my boy, you shot my baby." Fullilove admitted further that he refused to answer questions at a pre-trial deposition.

¶ 21    Other evidence established that Barbara Lopez, Claudia Lopez's mother, took custody of Claudia's two children after the shooting and, thereafter, gave police a Teletubby doll containing State's exhibit number 19, a .25-caliber semi-automatic Beretta Pistol. Also, police officers

recovered a green leafy substance, a yellowish-white rock-like substance, and a small digital scale from the toilet tank in apartment number 12. The parties stipulated that the green leafy substance was 69.6 grams of cannabis, and the rock-like substance was 4.1 grams of cocaine.

¶ 22    Kewhan Fields testified pursuant to a plea agreement with the State and explained its terms. The agreement was the same as the one entered into by Fullilove. Fields agreed that he had a 1998 conviction of possession of a controlled substance. Fields explained that in August 1999, he was one of eight members of the Elgin Black Disciples. Avery Binion, as chief, was the leader; Sherman Williams, as director, was the second-ranking member; and defendant, as Chief of Security, was the third-ranking member. Fields said that on the morning on August 16, 1999, he went to Binion's house to attend a gang meeting about a stolen safe. In all defendant, Binion, Fields, Lindsey, McCoy, Smith, and Williams attended the meeting. Binion told the group to go over to the schoolhouse and to handle that business about the safe. Defendant passed out firearms that were obtained from the stolen safe. Fields saw a .357 magnum revolver in defendant's possession at the meeting. Binion gave Fields a .380-caliber semi-automatic handgun at the meeting. After the guns were issued, Fields rode with defendant to the schoolhouse while Lindsey, McCoy, and Williams rode in a minivan driven by Smith.

¶ 23    Fields explained that the group went to Fullilove's apartment where defendant said something to the effect of, "If they get out of line we gonna hurt or kill them." Defendant checked to make sure that all the guns were loaded. After McCoy indicated that Carlisle was upstairs, defendant, Fields, Lindsey, McCoy, Smith, and Williams proceeded upstairs to tell Carlisle to leave Fullilove alone about the safe. Fields said that only he, defendant, Lindsey, and Williams were armed.

¶ 24    When they got upstairs McCoy knocked on the door of apartment 23. Carlisle and Cooper

came out and Williams and Carlisle had a heated conversation about the stolen safe that ended with Carlisle going back inside apartment 23 saying, "fuck this shit." At that point, Cooper was still sitting on the stairs going up to the third floor. Fields testified that Williams, while standing over Cooper, asked Cooper if he was riding with them, and Cooper said "yeah." Defendant was right next to Williams at the time. Fields testified that defendant and Williams both pulled out their guns and a shot sounded. Fields could not tell whether Williams or defendant shot Cooper. Williams said, "I'm tired of this shit, it's on, fuck these n***s" and, followed by defendant and Lindsey, went through the hallway door toward apartment 23. With that, Fields ran down the stairs shooting his gun once up the stairs into the wall. Fields later learned from police that his bullet hit Cooper in the arm. As he ran away, Fields heard gunshots coming from apartment 23.

¶ 25    Fields testified that he, McCoy, and Smith ran to the minivan and waited for Williams, defendant, and Lindsey before driving away. As they drove off, Williams said something to the effect of "we got the mother fucker[s], got the n***s." Defendant said that he shot somebody in the head, and Williams said that he shot someone wearing red who tried to jump out a window. Defendant asked, "did we kill everybody?" In the fleeing minivan, defendant gathered his, Williams's, Lindsey's, and Fields's guns into a paper bag. When Smith stopped the minivan on Route 19, McCoy got out and placed the paper bag containing the guns near a tire in the grass. Fields testified that the guns marked State's exhibit numbers 1C (a .380 caliber Walther PPK), 2C (a Colt King Cobra .357 magnum), 3C (a Ruger P89 9-millimeter semi-automatic pistol) and 4C (a Browning 9-millimeter semi-automatic pistol) were handguns that he, defendant, Williams, and Lindsey, respectively, carried on August 16, 1999.

¶ 26    On cross-examination, Fields agreed that when he first spoke to the police, he claimed that he was not at the schoolhouse on the date in question and had nothing to do with the shootings.

Fields said that he initially lied to the police in an effort to stay out of trouble. Fields admitted that when he gave his May 17, 2000, proffer to the State, he had said that Williams shot Cooper in the head. However, on cross-examination, Fields maintained that it could have been either Williams or defendant who shot Cooper. Fields also admitted that at Smith's trial he testified that he was not sure who had the gun marked State's exhibit number 2C, that it was either Williams or defendant; that he thought Lindsey had the gun marked State's exhibit number 3C; and that he did not know who had the gun marked State's exhibit number 4C.

¶ 27    Igna Baldwin testified that in August 1999, she and her boyfriend Eric Matthews were living in apartment 23 at the schoolhouse. According to Baldwin, Matthews's cousin Quanson "Gouda" Carlisle and Charles Keys were selling drugs out of apartment 23. In the morning on August 16, 1999, Baldwin returned to her apartment from work. Upon arrival at the door to the building, McCoy, who she knew as Avery Binion's cousin "Pooloo," and Williams opened the door to the building for her. Baldwin related that she had known Williams practically all her life and had known McCoy for about a year. Baldwin also saw Smith, Fullilove, Lindsey, and two men she did not know, standing inside the doorway to the building. As they ascended the stairs to the second floor, Williams and McCoy gave her a dirty look.

¶ 28    Baldwin heard Williams arguing with Carlisle. As Williams stood on the staircase going up to the second floor, he said something to the effect of, "We're going to get these pussy mother fuckers[,]" to Carlisle who, along with Anthony Cooper, was standing at the top of the stairs. At that point, Baldwin went into apartment 23 where she saw, among others, Corey Boey.

¶ 29    Next, Baldwin heard gunshots out in the hallway. Baldwin panicked, stood outside her room for a second, and then "heard a whole bunch of people coming into the apartment." Baldwin saw people jumping out the window, and she went into the bathroom from where she heard four

or five gunshots coming from the living room. She also heard Williams say "We got these pussy mother fuckers now; let's bounce." When Baldwin came out of the bathroom she saw that Boey had been shot and she called 911. On cross-examination, Baldwin agreed that a police officer had showed her a photograph array on April 19, 1999, that included a photograph of defendant but that she had not identified defendant. Baldwin clarified that she heard both Williams and McCoy in the living room after the shooting stopped.

¶ 30    Quanson "Gouda" Carlisle testified that he and his friends were selling cocaine and marijuana out of apartment 23 in the schoolhouse in August 1999. Carlisle identified State's exhibit 2C as the .357 magnum revolver that, along with other firearms, marijuana, and cocaine, was in the safe that he and his friends kept in apartment 28. After the safe was stolen, Carlisle and his friends suspected Fullilove ("Bay Bay"). On August 16, 1999, Carlisle walked out of apartment 23 and saw defendant, Fields, Fullilove, McCoy, Smith, Williams, and others that he did not know by name. Carlisle explained that Williams was all the way at the top of the stairs "in his face," and defendant was "kind of like at the bottom of the stairs." According to Carlisle, Williams said, "What's up with that stuff with you and Bay Bay[?] Man I came over to holler at you for chief." Carlisle explained that he took "chief" to mean Binion. In response, Carlisle said, "Man, I ain't. Fuck you[,]" and he turned around and went back into apartment 23. Minutes later, Carlisle heard a gunshot and "then they started kicking the door and came in there shooting." Carlisle and Charles Keys ran to the back bedroom from where they heard a "whole bunch of gunshots." Carlisle did not see who entered the apartment. When the gunshots stopped, Boey crawled into the bedroom.

¶ 31    On cross-examination, Carlisle denied membership in the Gangster Disciples street gang, admitting only to being an associate of that gang. Carlisle said sometimes the Black Disciples and the Gangster Disciples get along, and sometimes they do not. Carlisle said that the safe incident

was not a gang dispute but, rather, a financial dispute. Carlisle agreed that he had not been prosecuted for dealing drugs out of apartment 23.

¶ 32    Corey Boey testified that he was serving a 12-year sentence for armed robbery, possession of a controlled substance, possession of cannabis, and possession of a look-alike substance. Boey also admitted that he had prior convictions of misdemeanor and felony theft and had been adjudicated delinquent based on a finding that he had committed the offenses of attempt burglary and aggravated battery. Boey said that he did not receive any promises or deals from the State in exchange for his testimony.

¶ 33    Boey testified that he and his friend Taiwon Jackson went to see his cousin Carlisle at apartment 23 in the schoolhouse on the morning on August 16, 1999. Also present in apartment 23 were Baldwin, Carlisle, Cooper, Keys, and Thomas. At approximately 12:30 p.m. Boey was on the living room floor shooting dice when he heard gunshots coming from outside the door. Boey jumped up and sat on the couch. Next, he saw the door kicked open and defendant, Williams, and McCoy entered the apartment. Three or four shots were fired, and Boey remained on the couch. Next, Williams walked up to Jackson, who was seated on the couch, and shot him in the head. Williams then shot Thomas in the head. Boey thought that he was going to be killed so he rolled over onto the floor on the side of the couch and went into the fetal position. Boey said that he was shot once in the right side before he hit the floor. Boey saw the legs of someone standing alongside him and then a bullet entered his left thigh followed by shots to his left and right ankles. Boey played dead and the intruders left. Boey crawled to the bedroom and was ultimately taken to the hospital by ambulance.

¶ 34    On cross-examination, Boey said that he was smoking marijuana on the morning in question and was high. Boey said that he remembered talking to the police at the scene but told

them that he did not want to say anything, he just wanted to go to the hospital. Boey said that he did not remember talking to the police at the hospital or telling his mother and stepfather that Chris Smith shot him and his friends. Boey did not recall identifying Smith from an array of photographs shown to him while he was at the hospital and then starting to cry. Boey also did not recall giving the police a tape-recorded statement on August 18, 1999, in which he stated that Smith and McCoy entered apartment 23, and that he could not tell if anyone else had entered. Boey did not remember telling Detective Brictson that Williams, McCoy, and Smith entered apartment 23, and that Smith shot him. Boey did not remember talking to police on August 18, 1999, or to Detective Brictson at the jail in March 2000, or telling Detective Brictson that he was nervous about testifying against Smith at that time. Boey agreed that he testified at Smith's and McCoy's trials but did not remember telling prosecutors shortly before the Smith trial that when the door to apartment 23 opened, Smith was standing in the doorway. Boey did not remember admitting during his testimony at the McCoy trial that he had previously told Detective Padron that Smith shot him. Boey agreed that at the McCoy trial he admitted that he could have told the police that Smith had a gun in his hand. Boey explained that he did not recall telling the police that Smith came into apartment 23 and shot him, but indicated that he was not denying that he may have said so. Boey indicated that he had memory problems since he was shot on August 16, 1999. Boey did not remember telling police that it may have been Fullilove that was behind Smith and McCoy in the doorway or telling Candice Van Dyke that Smith had shot him.

¶ 35    Edward Rottman, a fingerprint examiner from the Illinois State Police Crime Laboratory, testified that he obtained cards containing known finger and palm prints for various suspects in this case from the Elgin police department. The examiner attempted to develop latent prints from the surfaces of five firearms. After utilizing three methods of lifting latent finger and palm prints

from the firearms identified as State's exhibit numbers 1C, 2C, 3C, 4C, and 19, the examiner found no prints suitable for comparison. The examiner did find a print suitable for comparison upon the magazine for State's exhibit number 19, the .25-caliber Beretta. That latent print was matched to a standard known to be that of Fullilove. The examiner was also able to obtain a print suitable for comparison from an "Eagle Country Market" paper bag (State's exhibit number 6A) submitted to him by the Elgin police department. The latent print on the paper bag matched a standard known to be that of McCoy. The examiner also obtained one latent print suitable for comparison from the minivan that matched a standard known to be that of Smith.

¶ 36    Dr. Bryan Mitchell, a forensic pathologist who performed autopsies on Anthony Cooper, Tremayne Thomas, and Taiwon Jackson, opined that each victim died as a result of gunshot wounds. The pathologist discovered four bullet wounds in the body of Anthony Cooper. One bullet wound was on the right side of the head with a corresponding exit wound on the right side of the neck from which two small bullet fragments were recovered. A second bullet wound was located on the left chest with a corresponding exit wound on the left back. A third bullet wound was located on the backside of the right forearm from which a bullet was recovered. The fourth bullet wound was located on the left thigh with a corresponding exit wound on the left buttock.

¶ 37    The pathologist discovered three bullet wounds in the body of Tremayne Thomas. One wound was above the right forehead just above the hairline from which a bullet was recovered. A second wound was on the back of the right shoulder from which a bullet was recovered. The third wound was in the left buttock. The bullet inflicting this third wound shattered the femur and was fragmented such that it could not be recovered from the body.

¶ 38    There were two bullet wounds in the body of Taiwon Jackson. One was to the right forehead near the hairline from which a bullet was recovered. The second was a graze wound to

the left foot. No bullet was recovered from this wound. All the bullets and bullet fragments removed from the bodies were turned over as evidence to Detective Spejcher.

¶ 39    Russell McLain, an Illinois State Police forensic scientist, testified as an expert in the field of firearms and firearms identification. McLain explained that the rifling inside of the barrel of a firearm has spirals called "lands and grooves" that cause a bullet to spin as it travels through the barrel in order to stabilize the flight of the bullet. Each firearm leaves unique striation marks or scratches on the bullets fired through its barrel. McLain also explained that semi-automatic firearms eject the bullet casings or cartridges after each bullet is fired and, in the process, leaves unique marks on the casings. McLain explained further that the firing pin of a revolver-type firearm leaves unique marks on the shell casings and that those casings remain in the firearm's cylinder until manually removed.

¶ 40    McLain identified State's exhibit number 1C as an Interarms model APDFEG .380-caliber semi-automatic handgun, better known as a Walther PPK; State's exhibit number 2C as a Colt King Cobra .357 magnum revolver; State's exhibit number 3C as a Ruger P89 9-millimeter semi-automatic pistol; State's exhibit number 4C as a Browning high-power 9-millimeter semi-automatic handgun; and State's exhibit number 19 as a Beretta .25-caliber semi-automatic handgun. McLain examined these firearms as well as various cartridge casings and fired bullets, all submitted to him by Elgin police officers. McLain explained that he performed microscopic examinations of the fired bullets and the spent casings submitted to him and took measurements of the land and groove impressions left in the bullets. McLain also performed multiple test firings of the five firearms in question, collected the projectiles, and took microscopic measurements of the land and groove impressions left in those bullets. McLain then made side by side microscopic comparisons of the bullets fired during the test firings and the bullets submitted to him by the Elgin

police officers. McLain also compared the casings from the bullets fired during the test firings with the casings submitted to him.

¶ 41    McLain determined that State's exhibit number 79, the bullet recovered from the right forearm of Anthony Cooper, was fired from the .380-caliber Walther PPK (Ex. 1C). McLain determined that State's exhibit number 31, a .380-caliber casing found on the stairs leading from the first floor to the second floor of the schoolhouse, was ejected from the .380 Caliber Walther PPK. With respect to State's exhibit numbers 80, 81, and 82, fragments from the front and back of the left leg and from the neck of Anthony Cooper, McLain was unable to determine which firearm fired the bullets resulting in those fragments. McLain could not definitively identify the firearm that fired State's exhibit number 34, a spent bullet found underneath the body of Anthony Cooper. Nevertheless, McLain opined that the bullet could have been fired through the Colt King Cobra .357 magnum revolver (Ex. 2C), and definitely could not have been fired through the barrels of any of the other four firearms. McLain identified State's exhibit number 32, which was found on the second-floor stairway landing, as a bullet fired through the barrel of the Colt King Cobra .357 magnum revolver (Ex. 2C).

¶ 42    McLain was unable to positively determine from which firearm State's exhibit number 28, a bullet with bullet fragments from the head of Tremayne Thomas, was fired. Nevertheless, McLain opined that the land and groove marks on that projectile were consistent with those on bullets fired from the Colt King Cobra .357 magnum revolver and inconsistent with bullets fired from the other four firearms. McLain explained that the bullet taken from Thomas's head came from a firearm with a barrel having left-spiraling rifling, and the Colt King Cobra .357 magnum was the only one of the five firearms with a barrel that had such rifling. McLain said the other four firearms had barrels with right-spiraling rifling, such that they could not have fired the bullet taken

from inside the head of Thomas.

¶ 43    McLain determined that State's exhibit number 29, a hollow point bullet recovered from inside the shoulder of Tremayne Thomas, was fired by the Ruger P89 9-millimeter semi-automatic handgun (Ex. 3C). McLain determined that State's exhibit number 30, the bullet recovered from the head of Taiwon Jackson, was fired through the barrel of State's exhibit number 3C, the Ruger P89 9-millimeter semi-automatic handgun. McLain indicated that no bullet or casing submitted to him came from State's exhibit number 19, the Baretta .25-caliber semi-automatic handgun, and that all the casings that were recovered from inside apartment 23 were 9-millimeters and ejected from State's exhibit number 3C, the Ruger P89 9-millimeter semi-automatic handgun. Finally, McLain determined that State's exhibit number 43, a bullet that the parties stipulated was removed from Corey Boey, was fired through the barrel of the Colt King Cobra .357 magnum (Ex. 2C).

¶ 44    Sergeant Sean Rafferty of the Elgin police department, an expert in the area of street gangs and street gang activity, testified that in August 1999 there were 10 to 12 gang members in the Elgin "set" of Black Disciples. According to Rafferty, defendant was the third highest ranking Black Disciple subordinate to Williams and Binion. Other Black Disciple gang members in the set included Fields, Fullilove, Lindsey, McCoy, and Smith. Rafferty also related that he and another officer went to 635 West Wellington in Elgin, the home of Avery Binion, on August 16, 1999, at 6:03 p.m. to arrest Willie McCoy. When Rafferty arrived, he observed defendant, Binion, McCoy, and Willie Wilder standing on the front lawn of the residence. After officers told McCoy he was under arrest, both Binion and defendant had "gotten between" the officers and McCoy. Only McCoy was arrested that evening. Rafferty also testified that on August 17, 1999, he recovered a small safe in a dumpster located behind the apartment building at 302 West Chicago Street, Elgin, where Byron Lemon lived. Rafferty identified State's exhibit number 46 as the safe he recovered

from that location. On cross-examination, Rafferty explained that street gangs fall into one of two categories, Folks or People. Black Disciples and Gangster Disciples are both Folks and, therefore, are generally aligned. Rafferty had no information that the Black Disciples and the Gangster Disciples were in any dispute prior to August 16, 1999.

¶ 45    Detective Brian Gorcowski of the Elgin Police Department testified that on August 17, 1999, after defendant waived his *Miranda* rights, he and other detectives interviewed defendant at the Elgin police department. Defendant told the detectives that he was in Chicago with his counselor at the date and time in question. However, after the counselor did not verify defendant's alibi, defendant said that the whole incident began when Fullilove and Tray One stole a safe that belonged to individuals in apartment 23. Defendant told detectives that he was at Binion's house in the morning on August 16, 1999. Also present were Fields, Byron Lemon, McCoy, Smith, and Williams. Defendant said that Fullilove briefly attended the meeting between 11 a.m. and 11:30 a.m. and that Binion issued various guns to those in attendance, except for defendant. One of those guns was a .357-caliber revolver, given to Fullilove.

¶ 46    Defendant explained to detectives that while Fullilove was at Binion's, defendant agreed to deliver some marijuana, cocaine, and a scale to Fullilove at apartment 12 in exchange for an ounce of cocaine because Fullilove did not want to take the drugs with him. After the others left in a minivan driven by Smith, an individual named Sid dropped defendant off near the schoolhouse. Defendant went to apartment 12 carrying a McDonald's bag containing a quarter pound of marijuana, some cocaine, and a scale. Defendant told detectives that inside apartment 12 he saw Fullilove, Byron Lemon, Smith, and Williams, all armed with guns.

¶ 47    As defendant tried to complete the transaction with Fullilove and leave, McCoy said, "Let's go take care of business." Defendant told detectives that the group left apartment 12 and went into

the stairwell leading to the second floor. Defendant said that, as he was standing by the double entrance doors, an individual named Myrance Thomas came by and engaged defendant in a conversation about an old drug debt. While speaking to Thomas, defendant turned his head and saw Fullilove fire twice at a subject standing on the second floor stair landing and saw McCoy shoot the same subject once. Defendant ran out of the building and down the street where Smith stopped the minivan and told him to get in. Smith stopped the minivan on Route 19, and McCoy gathered the guns from everyone in the vehicle and placed them in a paper bag. Defendant told detectives that there were four guns, two 9-millimeter semi-automatic handguns, a .380-caliber semi-automatic handgun, and a .357 magnum revolver.

¶ 48    At this point in the interview defendant led the detectives to the location on Route 19 where he said the guns were hidden. At that location detectives recovered the handguns defendant had described. After returning to the Elgin police department, defendant told Gorcowski that, at the meeting at Binion's house on the morning before the shooting, Binion told everyone, "[f]uck this. You all meet at Bay Bay's [Fullilove] crib, take care of y'alls business. Do what you have to do. Make sure everyone is dead."

¶ 49    Detective Gorcowski testified further that at approximately 5:09 a.m. on August 17, 1999, defendant agreed to give a tape-recorded statement. The tape recording was played for the jury, and the jurors were given transcripts of the statement. During the taped statement defendant admitted that he and Binion were members of the Black Disciples. Defendant indicated that the stolen safe was discussed at Binion's house the morning of August 16, 1999, and then Binion issued pistols to Fields, Fullilove, Byron "Tray One" Lemon, McCoy, Smith, and Williams. In the taped statement defendant related further:

"DEFENDANT: Okay, while I was at Avery [Binion's house], everybody came

over there. Um Bay Bay came, he said he couldn't stay long cause he had to baby-sit. Bay Bay gotta a .357, uh, like a silver long pistol with a black grip to it, Bay Bay left. Everybody was was [sic] told to be [sic] to meet at Bay Bay's house. Bay Bay called back and asked for his narcotics that he had left. Avery didn't know he left the narcotics and when he went down in the basement and found some, Avery told me to deliver these narcotics over to Bay Bay. I called, while I was talking to Bay Bay on the phone, I say, Bay Bay, I'm [sic] what I'm gonna get out the deal, and Bay Bay said well, what you want, I said a quarter ounce. He said cool, bring it to me, and I give it to you."

In explaining what happened when he arrived at apartment 12, the following exchange ensued:

"DEFENDANT: On Center Street. And I got into the apartment. That's where everybody was at. I says man, I says how y'all beat me here. And they said we came another way, so I gave Bay Bay the McDonald's bag which I was carrying a scale in. It had to ha been no more than 2 and ½, I mean, maybe three ounces of crack cocaine. Uh, a half a pound a weed. I charged Bay Bay a quarter ounce for deliverin this, uh, package to him, but it was already discussed prior with him about how much I was gonna be paid for delivering. Okay, I was s'posed to get my quarter ounce and I was s'posa leave.

GORCOWSKI: Okay.

DEFENDANT: Okay, but by that time, Bay Bay and alla them went upsta went upstairs and we was arguin, I came out from Bay Bay's house. I looked because there's two kids downstairs and he made them go into their room. I left outta there, came upstairs. I made it to the landing. By that time, they was arguin.

GORCOWSKI: This was the landing by the front door.

DEFENDANT: By the front door.

GORCOWSKI: And.

DEFENDANT: At that time, I came past Myron, Myron was on his way out the door. Myron say wh what askin me what I need. I say I don't need nothing, man, I just dropped off this packet. I'm dropping off a packet. And he said well, man, {unintelligible} some bullshit. I say I ain't. By that time, I'm looking at the standin, gunshots was fired. Well lem lemme backtrack.

GORCOWSKI: Let me back you up.

DEFENDANT: to the lady coming past. She asked em to get by. They let her by. By the time the door closed, well, I heard a door, I didn't see a door close, I heard a door close. Cause the doors close loud. Okay, and at that time when the door closed, they was arguin in the hallway. Gun fire came up, Okay.

GORCOWSKI: Lemme stop you there. Who were they arguing with and who was arguing?

DEFENDANT: Ah, um, I dunno. I dunno these guys names, but they

GORCOWSKI: Oh, you don't know his name, but there was a guy in the hallway.

DEFENDANT: There was two guys in the hallway that was arguing with Pooloo [McCoy], Tray One [Byron Lemon], Bay Bay [Fullilove], uh, Sherman [Williams], Ke ke Kewh Kewhan [Fields], um they was arguing with the two guys in the hallway.

\* \* \*

DEFENDANT: Okay, what happened after that was that when the argument broke down, de one of the guys that was arguing with {unintelligible} went through the entrance door. By that time, Bay Bay said man, I'm not gonna keep looking behind my back, man, cause I know they gonna do something to me. Bay Bay pulled out a long silver gun, which

happened to be, I believe it was a .357 Magnum, fired twice. The guy in the hallway fell by the time they broke through the fire door, I left out the entrance door to the building, went around the building.

GORCOWSKI: All right, let me stop you there for a second. After Bay Bay fired, did anybody else fire their gun?

DEFENDANT: Bay Bay fired, um, Pooloo fired.

* * *

GORCOWSKI: Did you hear more gunshots then?

DEFENDANT: When I was outside the building this like door got shot and it was like it was it was a ring of gun shots. A lotta gun shots. At that time.

GORCOWSKI: And you were runnin away from the building at this time?

DEFENDANT: I was, yes, I was runnin away from the building. At that time, I was goin down the center, is that Center Street?

GORCOWSKI: Center Street.

* * *

DEFENDANT: But I know I was going that way and by that time Chris [Smith], it was Chris, Kewhan, um, Sherman, um, {unintelligible} it was Chris, Kewhan, Sherman, Pooloo was in the van. They was in the van at this time. I did name Chris to be exact it was Chris, Kewhan, Sherman, Pooloo was in the van. They came past me. Now Bay Bay wadn't in the van. Bay Bay didn't, Bay Bay didn't come back in the van.

GORCOWSKI: Okay.

DEFENDANT: Cause he never got in the van {unintelligible}.

GORCOWSKI: Okay.

DEFENDANT: Bay Bay never got into the van. We left. They left. We got pa they got past me. Chris pulled over, told me to get in the van, said man, come on let's go let's go let's go. I said why what's up? He said man, just get in the van, get in the van. I got in the van. That's when

GORCOWSKI: Was Tray One in the van, too?

DEFENDANT: Uh, yes, he was. Tray One, Tray One was in the van, I'm sorry.

* * *

GORCOWSKI: From there, where'd you go?

DEFENDANT: From there they made a left and hit the expressway. Took the expressway all the way to Route 59 or 59 to Route 19. Then comin down 19, comin back into Elgin is where they all put pistols into a bag. A brown paper bag.

* * *

GORCOWSKI: Who put the pistols up by the

DEFENDANT: No, um

GORCOWSKI: fence, did you?

DEFENDANT: No, Tray One, when we when we stopped the car, Tray One got out the car, put the pistols by the fence. He said man that's a landmark right here, these tires will make us remember where we dropped the pistols off at. Okay? Then we came into Elgin. I said well, just drop me off. I'm gonna go home, man. And I went to the house."

Gorcowski testified further that the four handguns marked State's exhibits 1C, 2C, 3C, and 4C were the four handguns in the paper bag found along Route 19. The State then rested.

¶ 50    During his case, defendant first called Detective Chris Troiola, of the Elgin Police Department, who testified that Fullilove initially denied involvement in the shooting but then said

that Williams went upstairs to talk to Charles Keys about the stolen safe and that Fullilove then heard gunshots. Troiola said that Fullilove's next account was that Williams, McCoy, and Smith came over to his apartment armed with guns. Fullilove told Troiola that those three went up the south stairway while he went up the north stairway. Fullilove said that he fired twice from a distance of five or six feet from the door to apartment 23. Troiola agreed that Fullilove never mentioned defendant in any of these accounts.

¶ 51    Corey Boey's mother and step-father, Antoinette Johnson and Lloyd Johnson testified that, while at the hospital after being shot, Boey identified Chris Smith as the individual that shot him and identified Smith from an array of photographs shown to him by the police. Antoinette explained that she had basically raised Smith and that Smith had been a part of their family for 30 years. On cross-examination, Antoinette admitted that Boey was groggy and under the influence of medication when he identified Smith. She also admitted that Boey had memory trouble his entire life and had difficulty relating facts accurately.

¶ 52    Defendant also called Elgin Detective Jesse Padron who testified that he spoke to Boey at the emergency room on August 16, 1999, before Boey went into surgery. Boey told Padron that two guys came into the apartment and started shooting up the place. Later that same day, after Boey got out of surgery, Padron showed Boey an array of photographs and Boey immediately pointed to a photograph of Chris Smith and started to cry. Padron took a taped statement from Boey on August 16, 1999, which was played for the jury. In that statement Boey said that he saw Smith enter the apartment with a handgun and shoot Taiwon Jackson in the head. Boey said that he dove onto the floor and was unsure if Smith shot again. Another subject entered the apartment with Smith, but Boey could not identify that person. Padron spoke with Boey again on August 18, 1999, and showed Boey another array of photographs, which included photographs of Smith and

Willie "Pooloo" McCoy. Boey's taped statement of August 18, 1999, was also admitted into evidence and played for the jury. In that statement Boey said that McCoy was the second subject to enter the apartment behind Smith. Boey said that he saw Smith shoot Taiwon Jackson. Boey also said that a third subject entered the apartment, but that he could not identify that person. Padron agreed that Boey did not mention defendant in either the August 16 or 18 interviews.

¶ 53    Defendant Mark Bricston of the Elgin Police Department who testified that he spoke to Corey Boey on February 24, 2000, at the Kane County Jail when Boey indicated that he was afraid to testify against Smith. At that time Boey told Brictson that Williams burst into the apartment firing a gun on the day in question. Boey clarified that Smith shot him. Brictson agreed that Boey never mentioned defendant.

¶ 54    Victoria Cooper testified that she was outside the entrance to the schoolhouse on August 16, 1999, and saw Fullilove inside on the second-floor stairway landing waving a gun. At the same time, she "saw bullets hit the window" and "sparks hit the windows." She did not see her son Anthony Cooper inside the schoolhouse. Victoria ran to the corner liquor store and called the police. One hour to ninety minutes later Victoria saw Fullilove on the sidewalk outside of the schoolhouse and told him, "You are a dirty son-of-a-bitch, you shot my son. You didn't see me, but I seen you." On cross-examination, Victoria admitted that in a tape-recorded statement that she gave to Detective Brictson on August 16, 1999, she said that she was a good 60 feet from the door when she heard four or five gunshots. Victoria also admitted that at a previously held deposition she testified that she could not tell if the person she thought was Fullilove had a gun in his hand and, in turn, could not tell if he fired a gun. Victoria admitted that the sun caused a glare on the window she was looking through, that she did not actually see Fullilove shoot her son, and that she could see only the back of the man she thought was Fullilove. Victoria agreed that she merely

assumed that Fullilove was the one who shot her son.

¶ 55    Finally, defendant recalled Detective Gorcowski who agreed that Victoria Cooper was yelling when he arrived at the schoolhouse on the afternoon in question and that she said that Fullilove shot her son. When Gorcowski spoke to Kewhan Fields on August 17, 1999, Fields initially denied being at the schoolhouse at all on the day in question and then, upon hearing some details regarding the investigation, stated that he no longer wanted to speak to Gorcowski and that he wanted a lawyer. Gorcowski spoke to Sherman Williams on September 5, 1999, and Williams said that while in the fleeing minivan, Fields said "I busted old boy's shit on the stairs. I busted him good" and Lindsey said that "his shit jammed."

¶ 56                                II. ANALYSIS

¶ 57    At issue in this appeal is whether the summary dismissal of defendant's postconviction petition at the second stage was in error. Defendant maintains that his petition made a substantial showing of ineffective assistance of both trial and appellate counsel. He argues that appellate counsel was ineffective for failing to challenge the trial court's admission of gang evidence, and that trial counsel was ineffective for failing to call several witnesses.

¶ 58    A postconviction proceeding is a collateral attack on a prior conviction which permits defendants to challenge their convictions or sentences based upon a substantial violation of their federal or state constitutional rights. *People v. Swamynathan*, 236 Ill. 2d 103, 113 (2010). Postconviction claims are limited to matters which were not and could not have been previously adjudicated. *Id.* The Act provides for a three-stage proceeding. *Id.* At the first stage, the trial court reviews the petition to determine whether the defendant has set forth the gist of a constitutional claim, or if the petition is frivolous or patently without merit. *People v. Edwards*, 197 Ill. 2d 239, 244 (2001). At the second stage, defendant may be appointed counsel to amend their petition, and

the state may move to dismiss. *People v. Domagala*, 2013 IL 113688, ¶ 33. At this stage the trial court must determine whether the petition has set forth a substantial showing of a constitutional violation. *Id.* If defendant makes the requisite showing, the matter may proceed to a third-stage evidentiary hearing. *Id.* ¶ 34.

¶ 59  We review the dismissal of a postconviction petition without an evidentiary hearing *de novo*. *People v. Sanders*, 2016 IL 118123, ¶ 31. A second stage proceeding tests the legal sufficiency of the petition. *Domagala*, 2013 IL 113688, ¶ 35. On appeal from the dismissal of a second-stage postconviction petition, we consider whether the allegations in the petition, when liberally construed in favor of the defendant and taken as true, are sufficient to invoke relief under the act. *Sanders*, 2016 IL 118123, ¶ 31.

¶ 60  To prevail on a claim of ineffective assistance of counsel, defendant must demonstrate that counsel's representation "fell below an objective standard of reasonableness" and that such a shortcoming was prejudicial in that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington,* 466 U.S. 668, 687-94 (1984); see *People v. Albanese*, 104 Ill. 2d 504, 526-27 (1984) (adopting *Strickland*).

¶ 61          A. Ineffective Assistance of Appellate Counsel: Gang Evidence

¶ 62  Trial counsel made several efforts to bar the admission of evidence of gang activity and affiliation of defendant and others, including filing a motion *in limine*, objecting to Rafferty's testimony as a gang expert, and raising the issue of gang evidence in defendant's motion for new trial. Defendant argues that he made a substantial showing of ineffective assistance of appellate counsel where appellate counsel failed to argue on appeal that the admission of gang evidence at trial was error. We disagree.

¶ 63    To establish that appellate counsel was ineffective, respondent must satisfy the standard set forth in *Strickland. People v. English*, 2013 IL 112890, ¶ 33. "Appellate counsel is not obligated to brief every conceivable issue on appeal, and it is not incompetence of counsel to refrain from raising issues which, in his or her judgment, are without merit, unless counsel's appraisal of the merits is patently wrong." *People v. Easley*, 192 Ill. 2d 307, 329 (2000).

¶ 64    Though jurors may have a strong prejudice against street gangs, particularly in metropolitan areas, evidence of gang affiliation need not be excluded if it is otherwise relevant and admissible. *People v. Smith*, 141 Ill. 2d 40, 58 (1990). "Such evidence may be admitted so long as it is relevant to an issue in dispute and its probative value is not substantially outweighed by its prejudicial effect." *People v. Johnson*, 208 Ill. 2d 53, 102 (2003). Evidence of a defendant's gang affiliation is generally admissible to show common purpose or design, or to provide motive for an otherwise inexplicable act. *Smith*, 141 Ill. 2d at 58. "Such evidence, however, is only admissible where there is sufficient proof that such membership or activity is related to the crime charged." *Id.* Evidence of gang affiliation is relevant if it tends to make the existence of a consequential fact more or less probable than it would be without the evidence. *People v. Villarreal*, 198 Ill. 2d 209, 232 (2001). The trial court's rulings regarding the admission of gang evidence are reviewed for an abuse of discretion. *Johnson*, 208 Ill. 2d at 102.

¶ 65    Defendant argues that it was error to admit evidence of gang affiliation as there was other less inflammatory evidence which could have served the same purpose. See *People v. Joya,* 319 Ill. App.3d 370, 376-77 (2001). Defendant maintains that the evidence showed that the stealing of the safe was purely a financial matter, and there was no evidence of a dispute between the Gangster Disciples and Black Disciples. Defendant further maintains that while the gang evidence may have been relevant to show why he and the others would act in concert, their behavior is adequately

explained by the loyalty of friendship. He also argues that nobody fired shots as a result of a gang order.

¶ 66    We disagree. While there is no evidence that Fullilove's initial theft of the safe or the subsequent confrontation with Keys and Carlisle had anything to do with the parties' gang affiliations, we cannot say the same regarding the later shooting. Summoning seven armed men to kill the associates of those who issue a threat goes beyond the bonds of most friendships.

¶ 67    The evidence showed that all of the perpetrators were Black Disciples members. The apartment and people they attacked were believed to be affiliated with another gang. The Black Disciples assembled at the home of their chief, Avery Binion. met at Binion's house to discuss what to do regarding the safe. According to at least one witness, firearms were distributed by defendant, who was the gang's head of security. Binion then told the assembled members to "take care of business." Defendant himself told police that Binion told them to "make sure everyone is dead." The gang members once again assembled at Fullilove's apartment and then went upstairs to confront the occupants of apartment 23. Accounts differ as to precisely who went where, but Carlisle testified that Williams told him, "I came over to holler at you for chief," which Carlisle took to be Binion. The Black Disciples members then shot Cooper, Thomas, Jackson, and Boey, when it had been Keys and Carlisle who had confronted Fullilove about the stolen safe. After the shooting all but Fullilove fled in a van together and hid the guns in a tire near Route 19.

¶ 68    Put simply, the confrontation outside of apartment 23 and subsequent killings were clearly gang related. The gang testimony provided important context for the group's actions, which would otherwise be inexplicable, and showed their common motive and design. Of particular importance in showing that defendant shared a common design with the other perpetrators was the testimony of Fields and Rafferty that defendant was the head of security for the Elgin Black Disciples, which

belied his statement to police that he was merely delivering drugs to Fullilove's apartment at the time of the shooting. As such, it was not an abuse of discretion to admit the evidence of defendant's gang affiliation, and therefore, defendant did not make a substantial showing of ineffective assistance of appellate counsel.

¶ 69        B. Ineffective Assistance of Trial Counsel: Failure to Call Witnesses

¶ 70    Defendant argues that his petition made a substantial showing that trial counsel was ineffective for failing to call Myrance Thomas, Daren Wilder, Candis Van Dyke, Leonard Boey, and Teron Lemon to testify for the defense.

¶ 71    As an initial matter the State argues that by failing to attach affidavits from the proposed witnesses, defendant has failed to make a substantial showing to support his claim of ineffective assistance of counsel. However, an affidavit is not the only manner in which a postconviction claim of ineffective assistance for failure to call a witness may be supported. *People v. Dupree*, 2018 IL 122307, ¶ 32. (holding that postconviction claims may be supported by affidavits, records, or other evidence). In the instant case defendant has proffered the witnesses' testimony by pointing to the record, including police reports, recorded interviews, and trial transcripts. As such, we consider the substance of the petition.

¶ 72    Decisions regarding whether to call certain witnesses on a defendant's behalf are matters of trial strategy left to the discretion of trial counsel. *People v. Enis*, 194 Ill. 2d 361, 378 (2000). Matters of trial strategy are "virtually unchallengeable" on ineffective assistance grounds. *People v. Palmer*, 162 Ill. 2d 465, 476 (1994). Decisions regarding which witnesses to present are matters of trial strategy. *People v. Perry*, 224 Ill. 2d 312, 355 (2007). To prevail on a claim for ineffective assistance of counsel regarding a matter of trial strategy, defendant must show that counsel's strategy was objectively unreasonable. *Id.*

¶ 73    We disagree with defendants' assertion that he set forth a substantial showing that trial counsel was ineffective for failing to call the listed witnesses.

¶ 74    Much of what defendant claims the proffered witnesses would testify to are statements made by Boey that Smith had shot him. Defendant argues that Daren Wilder, Candis Van Dyke, and Leonard Boey would state that Corey Boey told each of them individually that it was Christopher Smith who shot him. Further, Wilder would testify that Smith told him that he was going to pay Boey to change his statement.

¶ 75    Even accepting the proffered testimony as true, trial counsel thoroughly cross-examined Boey on his prior identification of Smith as the shooter and introduced a significant amount of evidence in rebuttal on this point. This included testimony from Boey's mother and stepfather that while in the hospital after the shooting, Boey identified Smith as the shooter, and identified Smith in a photo array shown to him by police. The defense also presented the testimony of Detective Padron who spoke with Boey on August 16 and 18, 1999. In those conversations, Boey stated that Smith had shot Taiwon Jackson in the head. He also identified McCoy as entering the apartment behind Smith, and stated there was a third individual he could not identify. These statements were recorded and played for the jury. Finally, the defense called Detective Bricston who testified that he spoke to Boey on February 24, 2000. Boey told Bricston that Smith shot him, he was afraid of testifying against Smith, and that Williams had burst into the apartment firing a gun. In closing, even the prosecution admitted, "[Boey's] given so many stories, you really don't know what the truth is when he tells you what happened."

¶ 76    As such, any further evidence regarding Boey's identification of Smith as the shooter would have been cumulative, and trial counsel was not deficient for failing to present additional testimony on the subject. See *People v. Johnson*, 183 Ill. 2d 176, 208 (1998).

¶ 77    Defendant maintains that had Teron Lemon been called he would have testified to seeing a group of black men running from the schoolhouse. One of them, who was around 18 to 22 years old and about 5'9" tall with a muscular build threw away a silver chrome handgun. Defendant argues that Teron Lemon's testimony would have tended to prove that defendant did not possess that weapon, as he was around 40 years old at the time. We do not find that the failure to call Teron Lemon arises to the standard of objectively unreasonable.

¶ 78    There were five firearms recovered in this case, and along with defendant there were seven people in the group that shot up apartment 23. Showing that defendant did not possess that particular gun at that particular point would not prove that he did not possess a gun that day. If anything, the testimony might have introduced an additional gun to the equation, as the discarded gun would not have been among those recovered near the tire on Route 19 or from the Teletubby doll. That would make it six guns for seven people. Further, as we held on defendant's direct appeal, there was sufficient evidence to have found defendant guilty on the basis of accountability. So, it was not necessary for the jury to have found that defendant actually shot anyone, or even possessed a gun at all. Teron Lemon also stated to police that he saw "more than five" people in the group that fled the schoolhouse. There were seven Black Disciples members at the schoolhouse, and Fullilove went to hide his gun in the Teletubby doll and did not flee with the others in the van. If there were more than five people in the group fleeing the schoolhouse, this would cut against defendant's claim that he left the schoolhouse as soon as the shooting began and was not with the others when they initially left the schoolhouse. As such, we cannot say that trial counsel's strategy to not call Teron Lemon was objectively unreasonable.

¶ 79    Defendant maintains that he made a sufficient showing that trial counsel was ineffective for failing to call Myrance Thomas. We disagree.

¶ 80     Reviewing the statement Myrance gave to police, and his testimony at Smith's trial, his account of events was as follows: Myrance was at apartment 23 the day of the shooting. He left the apartment around 12:25 p.m. and was standing near the door to the building when he saw defendant, Fields, Lindsey, McCoy, Smith, and Williams approaching. He opened the first door for them, and they buzzed apartment 12, looking for Fullilove.[1] Fullilove came up from his apartment on the lower level to meet them. Myrance had a brief discussion with defendant about some money defendant owed him from a drug deal. The group went upstairs to the second floor and McCoy called Carlisle on his cellphone. Carlisle came out and the group started talking with him. Myrance then went outside to talk with Victoria Cooper. After some time, he began to head back towards the building. As he got to the door, he heard gunshots and began to run away from the building. Myrance looked back to see what was going on, and saw defendant, Williams and Smith running out of the building. Smith was holding a silver handgun.

¶ 81     Defendant argues that this testimony contradicts the State's theory that defendant and the others met in Fullilove's apartment to discuss their plans before going to Apartment 23. Defendant also argues that it establishes Smith as one of the shooters and corroborates Carlisle's testimony that defendant was standing towards the bottom of the stairs.

¶ 82     While this may be true, Myrance's version of events would also contradict key elements of defendant's account to the police, namely, that defendant merely went to Fullilove's apartment to deliver drugs and found the others already assembled, and that he left the building as soon as the shooting started. Further, defendant was charged both as a principal and accomplice for the

---

[1]Myrance referred to Fullilove by his nickname, Bay Bay, however Myrance stated that his real name was Justin Sommerfield.

shootings, the jury could have found him guilty whether or not he was one of the shooters. Accordingly, trial counsel's decided to present defendant's account to the police as the truth, that he was at the schoolhouse solely to deliver drugs to Fullilove and that he left once the shooting started. In light of this reasonable trial strategy, we cannot say that the decision not to call Myrance was objectively unreasonable.

¶ 83    Having determined that trial and appellate counsel's conduct did not fall below an objective standard of reasonableness as set forth under the first prong of the *Strickland* analysis, we need not reach the second prong of the analysis. See *People v. Colon*, 225 Ill. 2d 125, 135 (2007) (the failure to satisfy either prong precludes a finding of ineffective assistance of counsel).

¶ 84                                III. CONCLUSION

¶ 85    For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 86    Affirmed.